MARY GOUCAN, Appellant, v. ATLAS PORTLAND CEMENT COMPANY and L. J. BOUCHER.—298 S. W. 789.

Division One, July 30, 1927.

1. **NEGLIGENCE: Master and Servant: Safe Place.** It is a continuing duty of an employer to furnish his servant with a reasonably safe place in which and reasonably safe appliances with which to do his work, and to avoid an enhancement of the natural risk of his employment.

2. ———: ———: **Dangerous Work.** The fact that the work in which the servant is engaged is inherently dangerous does not absolve the master from the duty of exercising reasonable care to avoid an enhancement of the natural risks of the employment.

3. ———: **Substantial Evidence: Demurrer.** Where there is any evidence to sustain plaintiff's action it must be submitted to the jury, and every favorable inference of fact must be made in his favor in ruling on a demurrer to his evidence.

4. ———: **Explosion: Evidence Contrary to Physical Facts: Other Causes.** The court will disregard testimony upon a material issue which is contrary to the physical facts, or which being necessarily relied upon is inherently impossible, or where the inferences deducible therefrom are so opposed to all reasonable probability as to be manifestly false. But where a blaster was killed by the explosion of 125 pounds of dynamite in a hole drilled to the depth of fifty-three feet, at a distance of twelve feet from two other holes in each of which was the same amount of dynamite, it will not be

held, because the explosion in the first hole failed to explode or disturb the dynamite in the other two, either by jarring rocks down on the dynamite in them or by the concussion itself, that a 1200-pound metal stem of a drill working twelve feet from all the holes could not produce an' explosion by percussion in the first hole, on the ground that the explosion was contrary to the physical facts, where (a) the dynamite in the other two could not have been exposed either to the action of possible sparks or the impact of falling rocks, and the force of the explosion was upward, and not lateral, and (b) there is positive evidence that pieces of rock projecting inwardly from the circumference of the first hole were shaken loose, and caused to fall by the jarrings of the drill, and that if dynamite is struck sharply when it is resting upon a hard surface an explosion will be produced by the percussion, or blow.

5. **NEGLIGENCE: Explosion: Two Independent Causes.** If there were present two independent causes, and no proof as to which of the two caused the accident, there can be no recovery; but the rule has no application, where the dynamite in the hole, which exploded and caused the death of the blaster, may have been exploded in one of three ways, namely, by spark resulting from one piece of rock falling upon another in close proximity to the dynamite, or by impact of rock falling on the dynamite, or by shock or sharp percussion of the neighboring drill communicated to the dynamite, and the proximate cause of the explosion was the negligent operation of the 1200-pound metal stem of the drill within a few feet of the hole while it was being loaded with the dynamite, which shook loose pieces of rock in the hole and caused them to fall; and particularly so, where the allegation was that, whether the explosion resulted from sparks or percussion, defendant's negligent operation of the drill was the proximate cause, and the evidence shows that its operation was negligent and that it was the proximate cause, and so linked with the explosion as to make it a natural result of the negligent act.

6. ————: **Experienced Workman: Apparent Danger: Assumed Risk.** Notwithstanding deceased was an experienced blaster, if he was working under the direct supervision, orders and control of defendant's foreman, and the danger of attempting to remove a choke in a hole of a quarry which he was filling with dynamite was not so apparent as to cause a man of ordinary prudence to disobey the command of his superior, it cannot be ruled as a matter of law that, in attempting to remove the choke amid dangerous conditions, in obedience to the order of and upon assurances of safety by the foreman, he assumed the risk of an explosion.

---

Corpus Juris-Cyc. References: **Master and Servant**, 39 C. J., Section 441, p. 312, n. 14; Section 442, p. 314, n. 22; Section 459, p. 338, n. 2; Section 1316, p. 1122, n. 83; Section 1336, p. 1149, n. 57. **Negligence**, 29 Cyc., p. 491, n. 46. **Trial**, 38 Cyc., p. 1532, n. 24; p. 1543, n. 67.

Appeal from Ralls Circuit Court.—*Hon. Charles T. Hays*, Judge.

REVERSED AND REMANDED.

*Rendlen & White* and *D. M. Stoud* for appellant.

(1) Where there is any evidence to sustain plaintiff's action it must be submitted to the jury. Every favorable inference of fact must be made in favor of plaintiff in ruling the demurrer. Twohey

v. Fruin, 96 Mo. 109.   Defendants were guilty of actionable negli-
gence in permitting and causing the ponderous drill to be operated
twelve feet away from the hole being loaded with dynamite, render-
ing extra hazardous an already hazardous work and making the
place of work thereby unsafe for the work in which decedent was
engaged.   Roberts v. Jones, 156 Mo. App. 558.   The facts and cir-
cumstances in evidence and favorable inferences therefrom made a
submissible case, and if believed by the triers of fact entitled plain-
tiff to a verdict.   "In applying the doctrine of proximate cause it is
not necessary that the connection between the cause and the effect
shall be proved beyond the possibility of doubt, or that such con-
nection be cognizable by the senses.   It is sufficient if the evidence of
the connection produce that moral conviction upon which men are
accustomed to act in the important concerns of life, and it is only
necessary that the jury be reasonably satisfied that the alleged cause
was in fact the proximate cause of the effect complained of."   Bus-
well on Per. Inj., sec. 98, p. 156; Brady v. Railroad, 206 Mo. 537;
Dean v. Railroad, 199 Mo. 411; Callahan v. Warne, 40 Mo. 136.   (2)
The evidence discloses that one of two things alone caused the ex-
plosion, either (1st) the violent vibration or jarring and resultant
concussions of the stone walls of the hole around the charge of dyna-
mite where decedent was at work, produced by the heavy rapid
pounding of the 1200-pound steel stem of the drill twelve feet away,
which made sixty-two strokes to the minute, or (2nd) the jarring loose
of stone from the sides of the hole where decedent was at work by said
operating drill, vibrating the walls of the drilled hole and causing
loose stones to strike against each other, causing spark or concussions
exploding the dynamite.   Both these things were caused by the wrong-
ful and negligent operation of the ponderously heavy drill twelve feet
from the highly dangerous operation of placing a charge of dynamite
into the drilled hole.   Whether this negligence of defendants was
the proximate cause of Moga's death was under the evidence for the
jury to determine.   Chambers v. Chester, 172 Mo. 461; Twohey v.
Fruin, 96 Mo. 104; Dunn v. Railroad, 21 Mo. App. 198; Roberts v.
Jones, 156 Mo. App. 559.   (3)   Decedent complained about the drill
operating so close to the hole where he was loading dynamite and de-
ceased was told to go on, the drill would not stop, "they were in a
hurry."   This was in effect an assurance of safety on which Moga
had a right to rely.   Moga "did not assume the risk to which he was
exposed by the negligent order of his foreman."   Bane v. Irvin, 172
Mo. 306; Haworth v. Mineral Belt Tel. Co., 105 Mo. App. 165.   The
danger was not so glaring that no prudent man would have con-
tinued at his work.   Limbean and eighteen men under him did so con-
tinue.   The question at most is one for a jury, not the court.   Stephens
v. Ry. Co., 96 Mo. 212.

*Mahan, Mahan & Fuller* for respondents.

(1) The court did not err in sustaining defendants' demurrer to the evidence. There was no evidence to go to the jury on defendants' negligence. All testimony offered by the plaintiff negatived the allegation of negligence contained in plaintiff's petition. Where the evidence shows that the explosion of 125 pounds of dynamite at a distance of twelve feet from two holes loaded with 125 pounds of dynamite each, failed to explode or disturb the dynamite in these holes, either by jarring rocks down onto the dynamite or by the concussion itself, the court is justified in holding that a Star well drill working a like distance of twelve feet could not produce an explosion, especially when the hole was then half stopped up with a wooden pole reaching from the surface to the choked dynamite. Where the testimony of a witness upon a material fact is contrary to the physical facts, or where such testimony necessarily relied upon is inherently impossible, or the inferences deducible therefrom are so opposed to all reasonable probability as to be manifestly false, the court will disregard it. Callanan v. United Rys., 263 S. W. 446; Roseman v. United Rys., 251 S. W. 104; Spohn v. Railroad, 87 Mo. 74; Spiro v. Transit Co., 102 Mo. App. 250. (2) It was for the plaintiff to account for the explosion and the causes of it, and there being present at least two independent causes, and no proof as to which of the two was responsible for the accident, there can be no recovery. Fuchs v. St. Louis, 167 Mo. 620; Breen v. Cooperage Co., 50 Mo. App. 202; Searles v. Railroad, 101 N. Y. 661; Dobbins v. Brown, 119 N. Y. 188. Where all the facts connected with the accident fail to point to the negligence of the defendant complained of as the proximate cause of the accident, but show a state of affairs where an inference could be as reasonably drawn that the accident was due to a cause or causes other than the negligent act of the defendant, then the plaintiff cannot rely upon mere proof of surrounding facts and circumstances of the accident, and the defendant is not called upon to explain the cause of the accident, and to purge himself of the imputed or inferential negligence. Hartman v. Railroad, 261 Mo. 279; Coin v. Lounge Co., 222 Mo. 488; Fritz v. Railroad, 243 Mo. 62; McGrath v. Transit Co., 197 Mo. 104. The jury must not be left to guess or conjecture, and a verdict founded upon mere speculation or conjecture will not be allowed to stand. Chandler v. Railroad, 251 Mo. 592; Wagner v. Railroad, 178 Mo. 125; Trigg v. Lumber Co., 187 Mo. 234. Whenever from all the facts and circumstances in evidence a jury may without doing violence to the dictates of reason and common sense infer a given fact on account of its known relation to the fact proved, the court should not interpose its own different conclusion. But while this is correct, the due protection of property rights

demand that the court shall draw the line with a firm hand between tangible evidence and reasonable, legitimate deductions, and mere conjecture or speculation. Culett v. Light & Power Co., 220 S. W. 867. (3) It is probable that the negligence of Moga himself in carelessly using the pole to dislodge the choke of the dynamite caused the explosion. (4) Moga assumed whatever risk of injury there might have been by reason of his contract of employment. He was an experienced blaster, the situation was open and obvious and he had a chance to observe it, and by reason of his experience he understood it. If there were any danger he assumed the risk of that danger.

ATWOOD, J.—This is an action for $10,000 damages by Mary Goucan (formerly Mary Moga), widow of John Moga, deceased, against Atlas Portland Cement Company and L. J. Boucher, the superintendent in charge of its rock quarry, for the death of her husband occasioned by an explosion of dynamite while he was working for said company as a blaster in said quarry. At the close of plaintiff's evidence the trial court sustained defendants' demurrer thereto, and plaintiff suffered an involuntary nonsuit with leave to move to set the same aside. Plaintiff's motion thereafter made to set aside the nonsuit was denied and plaintiff has appealed from the court's ruling thereon.

Plaintiff's evidence was adduced on her amended petition, which charged that it was the duty of defendants to furnish her said husband with a reasonably safe place in which and with reasonably safe appliances with which to perform his duties, and to exercise ordinary care to keep said place and appliances reasonably safe for the performance of his duties, and to discover and remove anything from the quarry which would render his place of work not reasonably safe; that it was the duty of defendants to direct and control the manner in which the said Moga performed his work, that it was his duty to obey, and that he at all times relied and acted upon their superior knowledge, authority and assurances; that defendants failed to discharge their said duties to the said Moga; that while in the usual and ordinary manner under the orders, direction and supervision of defendants he was placing dynamite in a hole, known as hole number 2, drilled in a rock ledge of said quarry for that purpose, defendants carelessly, negligently and wrongfully directed and permitted the operation, in another drill hole in the same ledge and within twelve feet of the hole which the said Moga was then and there loading with dynamite, of a heavy mechanical contrivance known as a Star well drill which lifted and let fall with great force and violence about sixty-two times a minute a large steel stem weighing about 1200 pounds, jarring and cracking said rock ledge and caus-

ing stones to shake loose from the sides of the hole where the said Moga was at work and upon the dynamite therein; that the said Moga then and there protested against such operation of said drill, and protested against placing more dynamite in said hole while said drill was being so operated, but was directed and commanded by defendants' foreman having control and direction over him to put an additional half box of dynamite in said hole, and was told by said foreman that the work must be thus proceeded with, that they would not stop the drill, and that it would be safe for him so to proceed, and in obedience to said orders and directions and relying upon said assurances the said Moga so proceeded at all times in the exercise of due care on his part; that in connection with said work defendants supplied and furnished a wooden pole or tamping stick about two inches in diameter and about sixteen feet long which was customarily used in this kind of work by letting it down into the drill hole for the purpose of dislodging dynamite when the same became lodged in the hole before it reached the bottom; that under the direction and command of said foreman and while said drill was being negligently, wrongfully and carelessly operated by defendants as aforesaid, the said Moga placed said wooden tamping stick in said drill hole to dislodge some dynamite that became lodged therein about twelve feet from the top; that while he was thus engaged defendants negligently, wrongfully and carelessly continued the operation of said drill as aforesaid in such close proximity to the drill hole where the said Moga was at work that it "caused rock to fall into said hole from the sides thereof and onto other rocks in immediate proximity to the dynamite in said hole, which rocks so falling against each other and against said dynamite caused sparks or percussion which said sparks or percussion or both caused said dynamite to explode, which explosion killed said John Moga, or that said drill so negligently, wrongfully and carelessly operated as aforesaid in such close proximity to said hole number 2 caused such violent vibration and jar upon and about said hole as to cause sparks or percussion or jarring in said hole in and about said dynamite and said dynamite was caused thereby to be exploded; that in said violent explosion ensuing, said John Moga was instantly killed; that plaintiff does not know which of the alternative statements is true, but is informed and believes and alleges upon such information and belief, that one or the other of said alternative statements is true."

Defendants' amended answer was a general denial, coupled with charges of contributory negligence and assumption of risk. Plaintiff's reply was a general denial of the matters set up in defendants' answer.

From plaintiff's evidence it appears that at the time of his death John Moga was thirty-eight years of age, the husband of appellant

and the father of four children; that he was born in Rumania, but had been a naturalized American citizen for many years, and for nearly twenty years had worked for respondent Atlas Portland Cement Company in its quarries and was an experienced blaster. In some of the testimony Moga was referred to as a sub-foreman of the blasters, but it appears that he only served as such in the absence of the general foreman, Pete Limbean, who was present on the morning the explosion occurred and was in the active and sole charge of the blasters, including the said Moga, and the hammer-drillers, but did not have control of the Star well drill, the operation of which is alleged to have caused the explosion. It further appeared that it was defendant company's previous unbroken custom to have the necessary number of holes drilled and the machine moved out of the way and then have the holes loaded with dynamite under the instruction of a foreman; that "usually a drill is 300 or 400 feet away from the hole that is being loaded;" that it was the custom never to "start loading a hole until the Star well drill is moved away."

On the morning the explosion occurred Moga and the other blasters commenced loading holes at seven o'clock. A row of holes had previously been drilled about twelve feet from the outer edge of the ledge of rock, and a second row had been partially drilled about twelve feet back of and zigzag with the first row. Pete Limbean, under whose immediate direction and control Moga was working, testified:

"The Star well driller was about 150 feet inside, ready to go to work; the night crew had gone home and the day crew had come on at seven o'clock. That morning the Star well crew came on at seven, but did not start to drill until quarter of eight, because they had a bad hole, got their bit stuck in it and could not finish it because it was a bad hole; they were working on this hole when we started to load; the drill crew consisted of Mike Bayjohn and Eli Hickerson."

When the blasters began their work each took a hole to load. At hole number one, which was the first one in the first line of holes, was a blaster named Lupu. Moga was loading hole number two, which was the second in the first line of holes, while John Padrick and foreman Limbean were loading hole number three, which was the first hole in the second line of drill holes and located midway between and about twelve feet back of holes numbered one and two. Each of the drill holes was five and three-fourths inches in diameter and the one which Moga was loading had already been fully drilled to a depth of about fifty-three feet. Hole number five, having been previously drilled to an uncompleted depth of only about forty feet, was also located in the second row in a corresponding zigzag position with hole number three, about twelve feet back of hole number two. When Moga had finished placing one hundred pounds of dyna-

mite in hole number two he asked his foreman Limbean what he should do next, and Limbean told him that he should ascertain whether or not all of the dynamite was in the bottom of the hole. This. Moga did by lowering a wooden stick about four inches in diameter on the end of a rope, provided by defendants for that purpose, and reported to his foreman Limbean that the dynamite was all down, and his foreman thereupon told him to put in another twenty-five pounds and after that put on the percussion cap or detonator. At this juncture the Star well drillers let the stem of their drill down in hole number five to the uncompleted depth of forthy feet, and commenced to drill out the unfinished portion of about eleven feet. Witness Limbean testified that never before in his employment of about fifteen years by defendant company in this class of work had he known of such drilling being permitted in such close proximity while holes were being loaded with dynamite; that according to the previous custom the Star well drillers "would get their things out of the way and we would start loading the shot." As soon as the Star well drill was put in operation in hole number five Moga protested to his foreman Limbean that he did not want the drill to start up, that he had dynamite in the hole, that there were many loose rocks in the sides of the hole which would be shaken down on the dynamite by the operation of the drill, and that in putting in the additional twenty-five pounds of dynamite because of the noise he would be unable to hear the pieces drop. The evidence showed that the dynamite used was known as sixty per cent gelatin, coming in sticks about eight inches long and four inches in diameter, of a putty-like consistency which the blaster cut with a wooden knife into lumps about the size of a goose egg, and dropped them piece by piece in the drill hole; that from the sound of the impact of each piece the blaster was able to detect a choke in the hole as soon as it began to form. Witness Limbean testified that when this Star well drill was started he was standing at the drill hole where Moga was at work. He saw "the ground shaking up on top" and the drill made "such a noise you could not hear anything." He requested the drillers to cease operating the machine until the blasters could finish loading the holes, but they declined to do so, and Limbean thereupon directed the blasters, including Moga, to go ahead with their work; that they had orders to finish loading. When Moga had dropped the additional twenty-five pounds of dynamite in the hole he let down the wooden stick four inches in diameter tied to the end of a rope. It stopped about twelve feet below the surface of the ledge, and Moga said to his foreman, "Oh boy, dynamite stopped, lodged up here about twelve feet below the surface." His foreman, Limbean, thereupon told him to get a smooth wooden stick about two inches in diameter and sixteen feet long, provided by defendants

for such purpose, and dislodge the dynamite.   In this connection Limbean testified as follows:

"I told Moga to go ahead and do the work and get the dynamite down to the bottom of the hole.   I had authority from my supervisor, and he put the stick in and tried to drive the dynamite down; he worked about three minutes when the explosion came. . ∴ .   Moga had been punching in the dynamite about three minutes before the explosion occurred.   He was letting the pole up and down.   His pole was down to the dynamite and tamped it down and packed it down with his hands to go through the dynamite, to feel a soft place to go through and after he had gone through it he tried to make the hole bigger; to get water in it to wash the dynamite down with the water; he was doing that work when the explosion came.   He put that stick through the dynamite and could not go down any further.   He looked on the side of the wall and said, 'Rock on the side of the wall.'   He pulled it out and tried it on another side and it went through; this left a little hole; he pulled the stick out, leaving a hole an inch and a half, and he tried to put it on the side of the hole to make it large; when he pulled the stick out again the explosion occurred; dynamite is rather soft like putty; he was not pushing the dynamite down, but pushing his stick through the dynamite, to make a hole to pour water through; that way works the dynamite down; in pushing the pole through the dynamite it spreads the dynamite out against the sides of the hole.   When stick is pushed through the dynamite it begins falling down to the bottom, and it was the third time that he pushed the stick through that the explosion occurred. The pole was in his hands and down in the hole when the explosion happened."

The evidence further showed that Moga put this stick through the dynamite "slow and easy" and in the manner usually directed by defendants.

Witness Limbean further testified that "Lupu had loaded his hole first, and at the time of the explosion that hole was filled with dynamite and dirt and ready to go; Number 3 was full; had a full box in and had a cap on top and was ready to put other cap on. Padrick was ready to let the cap down into the hole; it was in his hand; he had not let the second one down when the explosion occurred.   He was letting the cap down with a wire from the top of the hole; we measured from the top of the hole down to the dynamite, so we could tell when the cap got down to the dynamite.   The hole was open from the top of the dynamite to the surface and no dirt had been put on the dynamite.   There was the same kind of dynamite in all holes; there was one open box of dynamite on the surface of the ground in the vicinity of Number 2 and about three feet from the hole; there were about five sticks left in one box when Moga started

to tamp the dynamite; there was about twenty-five pounds in the box by the hole Moga was loading at the time the explosion occurred; lots of fine stuff, rocks and dirt were scattered around, no big rocks.''

While the upward force of the explosion in hole number two was terrific, blowing Moga's body into bits, the lateral effect, probably due to the fact that no earth had yet been packed in the hole on top of the dynamite preparatory to shooting, was comparatively slight, for none of the dynamite in the other holes or lying loose in open boxes on the ground in close proximity to hole number two was exploded, and a helper standing about twenty feet away testified that he was not knocked down.

According to the evidence, from the bottom of hole number two for a distance of forty feet upward drill hole number two was in pure limestone, while for a distance of thirteen feet from the surface downward it was in red, brown and white flint mixed with rock. The first thing that Moga did when he commenced work on this hole was to lower the four-inch wooden stick to the bottom, and finding the hole clear he then commenced cutting and dropping in dynamite and continued doing so for about forty minutes. His foreman Limbean then looked into the hole and with the aid of a mirror could see the sides of the hole for a distance of about thirty feet from the surface. He observed that the upper twenty feet, approximately, was cracked, ''the stone sticking like fingers stick out on the hand in the edges of the hole.'' He saw ''loose rocks in the side of the hole,'' and particularly noticed one rock about six feet from the surface ''about the size of a big apple, round and had a sharp end.'' After the last twenty-five pounds of dynamite went in and the choke was discovered about twelve feet from the surface, he looked down the hole with the naked eye and discovered that this particular rock and others he had previously observed above the twelve-foot level were no longer there. It was further shown that such pieces of rock falling from the sides of the hole on each other would produce sparks varying in size and heat intensity with the size of the rocks and length of fall. The evidence also tended to prove that the operation of the Star well drill sharply jarred the earth with each stroke, caused the ground to vibrate and crack around hole number two, and caused rock to become loosened and fall into said hole from its top and sides. Witness Limbean testified that ''before Number 5 had been started to be drilled that morning there was no stoppage in Number 2 by rock having fallen in. Number 2 hole was clear, could see to the bottom of it, but from the surface of the ground and for thirteen feet down, I could see big stones sticking out ready to fall. . . . After the drill was started at hole number 5 the condition of number 2 hole changed by rock falling into it. . . . Every time the stem would hit, it would knock rocks off the edge down into the hole. . . .

The twenty-five pounds lodged on account of the rock that fell in; that I looked.''   .   .

Dr. John J. Kessler, chemical engineer, having qualified as an expert in high explosives, testified that either heat or percussion will occasion the explosion of dynamite. As to explosion by percussion he said: ''Does not necessarily mean any sort of blow will produce an explosion; if dynamite is struck with a hammer that does not necessarily mean it will produce an explosion; if struck sharply, and surface on which resting is harder, it will produce an explosion; that produces what is known as explosion wave, sort of vibration motion which proceeds with great rapidity in the case of dynamite.'' He gave it as his opinion that the very impact of the 1200-pound metal stem of the Star well drill, operated as described in this case, with the rock in hole number five, might explode the dynamite in hole number two by vibration alone. He also gave it as his opinion that the falling of a stone or stones from the sides of hole number two upon the dynamite beneath could produce an explosion either by the production of sparks or by the mere impact of the falling rock, but further said: ''In my opinion striking a pole three or four times back and forth through dynamite would not produce enough heat to cause explosion. In my opinion it would be impossible to cause sparks by pushing a pole through dynamite with small pieces of flint in the dynamite and rubbing against each other; in the case of a rock falling ten or twelve feet, the force of the fall would be greater than the rubbing of the rock by a piece of wood. In my opinion there would be practically no danger there, punching this stick through the dynamite with pieces of flint rock in it.''

Much of plaintiff's evidence was apparently given through an interpreter and the meaning of some parts of the record is more or less obscure, but we believe the above fairly outlines the same as it should be read and considered on demurrer, and the trial court held that it made no case for the jury.

Appellant affirms, respondents do not deny, and it is consistent with well-recognized authorities, that it was a continuing duty of defendants to use ordinary care to furnish the deceased with a reasonably safe place in which and reasonably safe appliances with which to do his work, and to avoid enhancement of the natural risks of his employment. [Bradley v. Ry., 138 Mo. l. c. 302; Rowden v. Mining Co., 136 Mo. App. 383; Roberts v. Jones, 156 Mo. App. l. c. 558.] The fact that the work in which the servant is engaged is inherently dangerous certainly does not absolve the master from the duty of exercising reasonable care to avoid enhancing the natural risks of his employment. It may also be conceded without citation of authority that where there is any evidence to sustain plaintiff's ac-

317 Mo. Sup.—59.

tion it must be submitted to the jury and every favorable inference of fact must be made in favor of plaintiff in ruling on a demurrer to plaintiff's evidence.

As to the respective functions of court and jury touching plaintiff's evidence in such a case this court held in Callahan v. Warne, 40 Mo. l. c. 136: "The existence of negligence is a fact to be proved, and for the jury to determine, when there is any competent evidence tending to prove it. But the question, what constitutes that fact, in any given case, or rather, what other facts and circumstances, being proved, amount to evidence of the existence of the main facts in issue, or tend to prove it? is, and must be a question of law."

Appellant assigns error in the ruling of the trial court sustaining defendants' demurrer to the evidence at the close of plaintiff's case and in overruling her motion to set aside the involuntary nonsuit. Respondents insist that plaintiff made no case for the jury and that the court's rulings are therefore without error.

Respondents contend that "where the evidence shows that the explosion of 125 pounds of dynamite at a distance of twelve feet from two holes loaded with 125 pounds of dynamite each, failed to explode or disturb the dynamite in these holes, either by jarring rocks down onto the dynamite or by the concussion itself, the court is justified in holding that a Star well drill working a like distance of twelve feet could not produce an explosion, especially when the hole was then half stopped up with a wooden pole reaching from the surface to the choked dynamite." In support thereof respondent cites Callanan v. United Rys. (St. Louis Ct. of App.), 263 S. W. 443, l. c. 446; Roseman v. United Rys. (St. Louis Ct. of App.), 251 S. W. 104; Spohn v. Railroad, 87 Mo. 74; and Spiro v. Transit Co., 102 Mo. App. 250; these cases holding that where the testimony of a witness upon a material fact is contrary to the physical facts, or where such testimony necessarily relied upon is inherently impossible, or the inferences deducible therefrom are so opposed to all reasonable probability as to be manifestly false the court will disregard it. We find no fault with this statement of the law, but should it be applied under the facts here in evidence?

The evidence showed that at the time the explosion occurred in hole number two, hole number one "was filled with dynamite and dirt and was ready to go." Hole number three was filled with dynamite, but no dirt had yet been tamped in, and the blaster who was working on this hole "had a cap on top and was ready to put other cap on." None of the dynamite in hole number one could have been exposed to the action of possible sparks or the impact of falling rocks. Nor is there any evidence from which it may reasonably be inferred that the dynamite in hole number three or that lying loose on the surface of the ground came in contact with any sparks or falling rocks

of any considerable size. From the fact that this dynamite did not explode, in the light of the testimony that dynamite may be exploded either by spark or percussion, it may reasonably be inferred that it did not come in contact with any spark or large falling rock. It follows, therefore, that the above argument advanced in support of the trial court's rulings, leaves out of account the possible cause of explosion by spark or the impact of sizable pieces of rock, and only takes into consideration the possible cause by lateral percussion resulting from the explosion in hole number two, which the physical facts in evidence indicate was comparatively slight. Furthermore, the testimony of Dr. Kessler clearly shows that it is not "any sort of blow" that will produce an explosion, but if dynamite is struck sharply when it is resting upon a harder surface an explosion will .be produced. The evidence was that this explosion which is admitted to have occurred and killed Moga might have been caused in any one of the three ways above mentioned. There was positive evidence that the condition of the upper twenty feet of hole number two was bad with loose rock sticking out on the sides ready to fall, that every stroke of the Star well drill shook the hole and caused rock to fall from the sides, that a rock "about the size of a big apple, round and had a sharp end" and a few other rocks were noticed "sticking into the wall" about six or eight feet from the surface "but they were not there after the dynamite lodged," that the foreman in charge of Moga was fully aware of these conditions, that he "looked into every hole with a looking glass," but there is no evidence that either hole number one or hole number three was in the condition here described. We hold that respondents' above argument does not justify the trial court's rulings as to the sufficiency of plaintiff's evidence.

Respondents next say that "it was for the plaintiff to account for the explosion and the cause of it, and there being present at least two independent causes, and no proof as to which of the two was responsible for the accident, there can be no recovery," citing Fuchs v. City of St. Louis, 167 Mo. l. c. 634, 635; Breen v. St. Louis Cooperage Co., 50 Mo. App. 202; Searles v. Railroad, 101 N. Y. 661; and Dobbins v. Brown, 119 N. Y. 188. Again we find no fault with this statement of the law, but question its application to the case made. ·

It is not disputed that the explosion occurred or that Moga's death resulted therefrom. The evidence was that the dynamite might have been exploded in any one of three ways, namely, by spark resulting from one piece of rock falling upon another in close proximity to the dynamite, by the impact of rock falling on the dynamite, and by the shock or sharp percussion of the drill strokes communicated to the dynamite. Plaintiff pleaded that whether the explosion resulted from sparks or percussion defendants' negligent operation of the

Star well drill was the proximate cause, while one of the defenses pleaded by defendant was that the deceased's injuries were occasioned by "the negligent, careless manner in which the said John Moga violently struck and tamped the dynamite in said hole." Dr. Kessler's evidence, as above indicated, completely refutes this claim that the dynamite was exploded by Moga's striking and tamping it, and there is no countervailing testimony. Respondents' above statement of their contention does not clearly indicate what is there meant by "two independent causes" of the explosion, but in the printed argument they say that the evidence "also indicates that if there were a rock holding this dynamite back he had pushed that rock out from underneath the dynamite and allowed the same rock to fall on down on top of the 100 pounds already in the bottom of the hole." This is not the specific act of negligence charged in defendants' answer. Furthermore, the rock which lodged in the hole and formed the choke must have been shaken from the sides of the hole by sharp percussions from the operation of the drill and not from the deceased's use of the wooden stick because the choke had occurred before he used the stick. It appears that Moga handled the stick at the command and under the immediate supervision of his foreman and in the manner usually employed preparatory to washing the dynamite down with water. There is no evidence that the rock forming the choke was dislodged and caused to fall by Moga's use of the wooden pole. It had previously fallen from an upper level without Moga's intervention and apparently from the drill vibrations, and a reasonable inference would be that it was again dislodged by the same cause and in falling exploded the dynamite by spark or impact. In Dunn v. Cass Avenue Ry. Co., 21 Mo. App. l. c. 198, Judge SEYMOUR D. THOMPSON said:

"It is sometimes loosely said, in judicial opinions, that the question whether the injury complained of was the proximate consequence of the negligence proved, or which there was evidence tending to prove, is generally a question of fact for the jury. But it is obvious that whether it will or will not be a question for the jury will depend upon the facts of each case. Where the connection between the act of negligence and the damages is so remote as to have no ground for difference of opinion among fair-minded men, as to whether the negligence was the natural cause of the damage, the judge should decide it, and should not submit it to the jury; but where a substantial doubt arises as to whether the damage was the natural and proximate, or a speculative and remote, result of the negligence, the question should be submitted to the jury under proper instructions."

In 29 Cyc. 491, the proximate cause is said to be "the efficient cause which set in motion the chain of circumstances leading up to the injury, and which in natural, continuous sequence, unbroken by

any new and independent cause, produced the injury. The primary cause will be the proximate cause where it is so linked and bound to the succeeding events that all create or become a continuous whole, the one so operating on the others as to make the injury the result of the primary cause."

As we view the case plaintiff presented substantial evidence as to the alleged proximate cause of Moga's death and her case should have gone to the jury. The court erred in sustaining defendants' demurrer to plaintiff's evidence and in subsequently refusing to set aside the order of nonsuit.

Respondents finally urge that plaintiff's evidence showed that Moga was an experienced blaster, that in attempting to remove the choke he did not use the wooden pole in the usual way, and that he assumed the risk. While he was an experienced blaster the evidence is clear that he was working under the direct supervision, direction and control of foreman Limbean, that the danger was not so apparent as to cause a man of ordinary prudence to refuse to obey the commands of his superior, and, as we have previously indicated, the fair, reasonable and necessary construction to be put on plaintiff's evidence as a whole in ruling the demurrer thereto is that he was attempting to remove the choke under the direct command, supervision and control of his foreman in the manner usually employed.

For the reasons above stated the order and judgment of the trial court refusing to set aside the previous order of nonsuit is reversed, and the cause remanded for a new trial.

All concur, except *Gantt, J.*, not sitting.