GLADYS M. YOUNG, as Administratrix of the estate of WARD P. YOUNG, v. W. W. WHEELOCK and WILLIAM G. BIERD, as Receivers of the CHICAGO & ALTON RAILROAD COMPANY, Appellants. —64 S. W. (2d) 950.

Division One, October 19, 1933.*

*NOTE: Opinion filed at May Term, 1933, August 3. 1933; motion for rehearing filed; motion overruled August 24, 1933; motion to transfer to Court en Banc filed; motion overruled at September Term, October 19, 1933.

994

*Charles M. Miller, Jones, Hocker, Sullivan & Gladney* and *Ralph T. Finley* for appellants; *Silas H. Strawn* of counsel.

*Eagleton, Henwood & Waechter* for respondent.

HYDE, C.—This is an action under the Federal Employers' Liability Act, Title 45, U. S. C. A. 51-59, for the death of plaintiff's husband, a fireman for defendant receivers. Plaintiff sued as administratrix for the benefit of herself and three minor children. Plaintiff's husband was killed when defendants' St. Louis-Kansas City passenger train was derailed near Independence, the evening of February 15, 1928. This train consisted of six cars and was about 535 feet in length. The engine and tender turned over on the left side of the track. The first four cars went off to the right but did not turn over. The two rear cars did not leave the rails. The negligence charged and submitted to the jury was that defendants' track was permitted to be and remain in a defective and dangerous condition; that the ties thereof were weak, rotten and decayed; that the rails thereof were not sufficiently spiked or secured; and that the train was negligently and carelessly operated at a high, excessive and dangerous rate of speed under the circumstances. The defendants' answer was a general denial. Plaintiff had a verdict for $15,000, and, from the judgment entered thereon, defendants have appealed.

The train was derailed while going down "Independence Hill," about one and six-tenths miles from the Independence station. The track there descended at 1.08 per cent grade and turned from the west to northwest on a three degree curve. Near the beginning of the curve, the track entered a cut over which there was a street car bridge. The engine of the train went in the ditch and overturned about 1200 feet beyond the street car bridge. Plaintiff's evidence as to a defective track was given by a witness who lived nearby and frequently walked the track, and who testified to experience in railroad bridge work. He said that the noticeable part of the curve was about 400 feet beyond the street car bridge; that between the point where the engine lay and the bridge he had seen a number of rotten ties which he estimated at between 75 and 100; that he saw fifteen or twenty places "where the spikes were entirely gone;" that he "noticed some stripped;" that he noticed places where "the head of the spike that fits over the rail, they were loose, some an inch or an inch and a half above the plate, partly out;" that he also noticed some broken tie plates; and that he had noticed this condition "some two or three months, maybe longer." He also testified that he noticed loose ties "when you stepped on one end of the tie with one foot the other end would strike the rail—"looseness." He estimated that this condition existed in twenty-five or thirty places. His testimony as to a soft condition of the roadbed and the weather conditions, on the day of the derailment, was as follows:

"Q. What sort of a day was that as to whether or not it was a cold day or a freezing or a thawing day? A. It was thawing. Q. What was the condition of the roadbed there, with reference to whether it was hard, packed or frozen, or whether it was soft and mushy? A. The entire neighborhood was in a state of mud—it was soft." (As to thawing weather and muddy condition near the wreck, he was corroborated by defendants' witnesses.)

Concerning the charge of excessive speed, plaintiff had the evidence of a witness who saw the derailment from a point near the street car bridge. He said he had just gotten off the street car there, and was walking toward his house, when he heard the whistle of the train and saw the headlight of the engine a few feet beyond the bridge. He estimated its speed as between sixty to sixty-five miles an hour. He based this estimate principally upon his experience with automobiles. He said that he noticed sparks coming from the wheels of the engine when it reached a point about 600 feet beyond the bridge. Plaintiff also had the evidence of a locomotive engineer as an expert who testified that thirty-five miles per hour would be a safe rate of speed on a track in good condition on such a grade and curve with such an engine and train. He testified that, if it was thawing so that the ground around the roadbed was soft, the maximum safe speed would be about twenty-five miles per hour. He further testified that a speed of sixty to sixty-five miles an hour downgrade around the curve would have a tendency to cause derailment; and also that "having something like 75 to 100 ties rotted, something like 15 to 20 spikes out and, perhaps, the same number of spikes lifted up an inch or an inch and a half and having some rail plates broken" would have a tendency to cause derailment.

The engineer of the train, called as a witness for defendants, testified to a general restriction of fifty miles per hour but said there was no special restriction for that particular curve. He said that just east of the curve, there was a restriction of forty miles per hour. He said that, in his judgment, he was going forty-five miles per hour, "no time over 50 miles," and that the usual speed there was "45 or 50 miles an hour." He said the train left Independence at 7:13 P. M., on time and was wrecked about 7:15 P. M. He was corroborated as to the time and the speed by the conductor, and other witnesses for defendants. They fixed the time of derailment at 7:15 to 7:17 P. M. The engineer further testified that he saw a dark object under the bridge; that the engine did not jump off where the dark object was; that he went about 200 feet more and then applied the emergency brakes; that he "was in hot water then;" that his "brakes were already set" about 100 feet before the engine wheel first left the rail; that about 323 feet from the bridge the engine left the track and ran 863 feet on the ties before it went down the dump (he based this on measurements of wheel marks); and that when it went

down, which was about 963 feet from where the emergency was applied, the train was traveling between twenty-five and thirty miles per hour. The engineer also testified that, after the derailment, he went back along the track with a flashlight to determine the cause and found nothing; and that he did not know what the dark object he thought he saw was but said it might have been a shadow. He further testified that a thawing condition around the roadbed causes low joints that could result in a derailment and that "if you have a thaw you have to take that into consideration." He testified, further, concerning this condition as follows:

"Q. You came down on this track this day at 45 miles an hour, at your usual rate of speed, just the same? A. Yes, sir. Q. And the only time you reduce your speed, as an engineer having in mind the possibility of derailment, due to thawing, is when the engine gives you a warning? A. When going over the road that day? Q. By that warning, if you had felt the rail give that night, you would be really more careful? A. Yes, sir; if the engine gets wobbly. Q. You don't do anything until the engine first gives you an indication of the fact it is wobbly, is that right? A. Yes, sir. Q. With reference to the weather conditions, you don't do anything toward determining whether or not an engine will stay on the rail until you get some reaction from the engine? A. Yes, that is the way you work it, from the engine. Q. In other words, you get the first reaction from the engine and then go to work reducing the speed, if you think it is necessary? A. Yes, sir."

It was defendants' theory that the train was intentionally derailed by a boy who was put off of one of defendants' freight trains that afternoon by a railroad detective. This boy, seventeen years old, was confined in the Kansas State Penitentiary for murder and his deposition was taken and read in evidence by defendants. He testified that he was "pretty near to the hill" when he was put off; that he walked to the curve and put an engine boiler bolt nut on the rail near the curve where the derailment occurred, and that he put a little chunk of brick and a couple of rocks around it. He said that, in about half an hour, he went back to Kansas City. Later he heard about the derailment at this place and about two days afterward he went out. He, then, saw some of the wreckage there. However, defendants' engineer, in his cross-examination, gave his opinion that such a nut could not have caused the derailment because it would not stay on the track even with bricks or rocks around it. He based this opinion upon his belief that the jarring of the rail from an approaching train would cause it to fall off and upon his experience in placing such a nut on the track near his engine wheel and trying to run the engine wheel over it, starting from a standstill. He said "the nut would scoot out."

The railroad had the testimony of its master mechanic, super-

visor of track, division superintendent, assistant superintendent, section foreman, and other witnesses not in their employ, that the track was maintained in good condition before the derailment. They also said that, after the wreck, the track, between the overhead street car bridge and the cars which remained on the rails, was still in good condition; and that the cars not derailed were taken back, over it, without any track repairs, to Independence soon after the accident. Some of these officials, investigating the cause of the derailment after midnight that same night, found a nut pressed into oblong shape showing marks which they said indicated it had been run over by an engine wheel. This nut was found by the side of the track, near the point where the first wheel marks on the ties were found. They also found brick dust and pieces of tile on and near the rail. According to the measurements these officials made, they found, 323 feet from the street car bridge, a mark on the ball of the outside (south) rail of the curve for twenty-three feet, running diagonally across it. From that point west for 522 feet, there were marks on the ties of the wheels of the front truck of the engine. Then, the marks of the driving wheels of the engine showed on the ties, and from there on to the point where the engine turned over, 341 feet, the ties were pushed out of place and the track badly torn up.

■ ■ Defendants' principal contention is that their demurrer to the evidence should have been sustained. They argue the proposition from several angles. First, they say the testimony that the boy in the Kansas State Penitentiary placed obstructions upon the track was uncontradicted and that it is, therefore, shown that the train was derailed by his unlawful act and not by any negligence of defendants. This argument overlooks the well settled rule that the jury were not required to believe this testimony. Moreover, the facts and circumstances, upon which plaintiff relies to show that defendants' negligence did cause the derailment, do contradict the theory that it was caused by an obstruction placed upon the track by this boy. In that respect this case may be distinguished from Atlantic Coast Line Ry. Co. v. Temple, 285 U. S. 143, 52 Sup. Ct. 334, 76 L. Ed. 670, cited by defendants, where the defense of intentional derailment was also made. In that case there was no evidence of any prior existing defects in track or of any excessive speed. The plaintiff there simply failed to produce any evidence whatever tending to show negligence on the part of the defendant. Nothing is better settled in our practice than that it is the province of the jury as the triers of the facts to weigh the evidence and pass upon the credibility of the witnesses and of their testimony. [Gannon v. Laclede Gas Light Co., 145 Mo. 502, 1. c. 515, 46 S. W. 968, 47 S. W. 907, 43 L. R. A. 505; St. Louis Union Trust Co. v. Hill, 283 Mo. 278, 1. c. 282, 223 S. W. 434; Keller v. St. Louis Butchers Supply Co. (Mo.), 229 S. W. 173, 1. c. 175; Morris v. Cement Co., 323 Mo. 307,

19 S. W. (2d) 865, 1. c. 872; State ex rel. Strohfeld v. Cox, 325 Mo. 901, 30 S. W. (2d) 462; Brock v. Mobile & Ohio Ry. Co., 330 Mo. 918, 51 S. W. (2d) 100.] We certainly cannot say that the jury had no reason to disbelieve this boy. There is much vagueness and evasiveness in his testimony, as well as uncertainty as to time and dates. Furthermore, even if the jury believed that this witness did place obstructions on the track there was reason for them to believe that the derailment was not caused by such obstructions. Both this witness and defendants' detective who put him off the train fixed that time around three o'clock in the afternoon. It was shown that at least one other freight train and one other passenger train went over the track after that time before the train which was derailed. The jury also had the evidence of defendants' engineer that such objects would not stay on the track. They alone were authorized to determine the matter.

Defendants further contend that the evidence was wholly insufficient to show that either the track was defective or that the train was being operated at an excessive speed. We think the facts above set out testified to by plaintiff's witnesses were substantial evidence of these charges. It was, likewise, for the jury to determine what weight they would give this testimony as against the contrary testimony of more witnesses on the part of the defendants. In determining these facts they could also, of course, take into consideration any facts favorable to plaintiff developed in the testimony of defendants' witnesses. Defendants also contend that even though there was some evidence of defects in the track and high speed, yet the evidence is wholly insufficient to show that these or either of them were the proximate cause of the derailment. We must consider this contention, as well as all others above made, in light of the fundamental and settled rules that a defendant's demurrer to the plaintiff's evidence admits as true every fact and circumstance which plaintiff's evidence tends to prove; that plaintiff is entitled to the benefit of every inference of fact which may reasonably be drawn therefrom; that the evidence must be considered in the light most favorable to the plaintiff; that the defendants' evidence must be disregarded except insofar as it may tend to aid plaintiff's case; and that such a demurrer can be sustained only when the facts in evidence and the legitimate inferences to be drawn from such facts are so strongly against plaintiff as to leave no room for reasonable minds to differ. [Stauffer v. Railway Co., 243 Mo. 305, 1. c. 316, 147 S. W. 1032; Goucan v. Cement Co., 317 Mo. 919, 1. c. 929, 298 S. W. 789; Morris v. Cement Co., 323 Mo. 307, 19 S. W. (2d) 865, 1. c. 872; Cech v. Chemical Co., 323 Mo. 601, 20 S. W. (2d) 509, 1. c. 511; Clark v. Atchison & Eastern Bridge Co., 324 Mo. 544, 24 S. W. (2d) 143, 1. c. 151.]

Reviewing plaintiff's evidence, in the light of these principles, we

think that, from the facts and circumstances which this evidence tends to show, it would be a reasonable inference for the jury to make that either the speed at which the train was said to have operated, or the defects testified to as having existed in the track, or both together, under the weather conditions existing, caused the derailment. In view of the expert testimony offered by plaintiff, the jury could reasonably find that a speed of less than sixty-five miles per hour, without specific defects in the track, could have caused it. Defendants say that the evidence of that speed was so insubstantial that it should be disregarded. We hold that it was sufficient to require the jury, who heard the qualifications of this witness, to pass upon the question of whether his estimate should be accepted, and to pass upon the issue of whether or not such speed was a proximate cause. They might find some basis for corroboration of his estimate in the time which elapsed, according to the engineer's testimony, while the train, starting from a station stop, traveled the one and six-tenths miles from Independence to the point of derailment. His shortest estimate was only two minutes. They could consider, also, the distance, he said the train ran after he applied the emergency brakes, 963 feet partly on the ties, after which he still thought its speed was about thirty miles per hour.

Defendants most strenuously insist that, although there was evidence of some defects in the track, no defects were stated to have been found near the exact point where wheel marks showed the engine first went over the rail and that they had positive uncontradicted evidence that no defects existed there. However, in view of the number of specific defects plaintiff's witness said he observed between the place where the engine overturned and the bridge, we cannot say that the jury could not have reasonably found that such a number of defects, in that short a section of track, caused or contributed to cause the derailment, but that on the contrary, accepting this testimony as true and drawing all legitimate inferences therefrom in plaintiff's favor, it is so strongly against plaintiff (so conclusively shows the contrary) as to leave no room for reasonable minds to differ about it. ▉ Under the Federal Employers' Liability Act, it was not necessary that either negligence in permitting the track to become defective or in operating the train at excessive speed be the sole cause of the derailment but only that the evidence show that it resulted in whole or in part from such negligence. [Title 45, U. S. C. A. sec. 51.] We must not overlook plaintiff's expert testimony that the number of defects, of the kind and character related, in 1200 feet of track created a condition which would tend to cause derailment. Any one of these defects might not cause it, but all of them or a number of them together might create a condition of the track which would cause it. It might not cause it to occur at the exact spot where any one of the defects existed. Defendants'

evidence was that there was a mark indicating that the front engine wheel did ride the top of the rail for some distance. Defendants' theory is that the obstruction placed on the track caused this wheel to mount the rail. How can we say that the jury could not find that the defects in the track caused it to do so? Defendants say because they had eleven witnesses who said there was no defect there (or anywhere), but that goes to the weight of the evidence.

A similar contention as to proximate cause was made in Clark v. Bridge Co., supra, namely: That, although there was evidence of a defective condition of the floor of a bridge, there was no substantial evidence to show a causal connection between the defect and the skidding of the truck which resulted in plaintiff's injuries there. This court held that there was sufficient evidence to make a submissible question of proximate cause for the jury, saying:

"We cannot say that there is an entire absence of any substantial or probative evidence sufficient to show a causal connection between the alleged defective and unsafe condition of the roadway of the east approach of the bridge, at or near the joint of the north rail of the railroad track, and plaintiff's injury. Neither can we say that the facts in evidence, and the legitimate inferences to be drawn from such facts, are such as to leave no room for reasonable minds to differ upon the question whether or not the skidding of the automobile truck and the resulting injury to plaintiff were directly and proximately caused by the alleged unsafe and defective condition of the roadway of the east approach of the bridge at or near the joint in the north rail of the railroad track. Such issue is one of fact, which must be submitted to the jury for determination; and it matters not what view the appellate court may entertain respecting the weight of the evidence, or respecting the credibility of the witnesses and of their testimony."

Upon a second appeal in the Clark case, recently decided (Clark v. Bridge Co., 333 Mo. 721, 62 S. W. (2d) 1079), the same contention was again made and this court adhered to its former decision, saying:

"The court has the right in any case to determine as a matter of law whether there is any substantial evidence to sustain an issue of fact, but, on determining that there is such substantial evidence, it will not go further and determine whether the weight of the evidence is in favor of or against the mooted fact. That is the province of the jury. . . . The court may properly reject evidence which is contrary to the physical fact or to know physical laws, or which is the result of evident mistake or ignorance, or, in short, when the evidence itself, or the other established facts, discloses its inherent infirmity. In doing this, however, the court does not weigh the evidence in the judicial sense of that term."

What is a proximate cause is ordinarily a jury question. [Milwaukee & St. Paul Ry. Co. v. Kellogg, 94 U. S. 469, 24 L. Ed. 256;

C. & N. W. Ry. Co. v. Struthers, 52 Fed. (2d) 88; see, also, N. & W. Ry. Co. v. Gillespie, 224 Fed. 316; St. Louis-San Francisco Ry. Co. v. Duke, 192 Fed. 307; Davis v. Wolfe, 263 U. S. 239, 44 Sup: Ct. 64, 68 L. Ed. 284, affirming Wolfe v. Payne, 294 Mo. 170, 241 S.W. 915.] Defendants rely upon Kane v. Missouri Pacific Ry. Co., 251 Mo. 13, 157 S. W. 644, where it was held that there was no substantial evidence that the negligence charged, in that case, was the proximate cause, and that because it was merely a matter of speculation and conjecture, whether it was or not, the case should not have been submitted to the jury. One of the charges of negligence was a defective track but as to this feature of the case the court said:

"As to the charge of a defective track, one witness, Wilcox, says it was 'rough'—nothing more. Another witness says it was a 'soft track.' There was also testimony to the effect that the track was not well ballasted at this point. All this is far from showing that the track was in a dangerous condition, and liable to derail an engine running at ten miles an hour. We apprehend that rough tracks, soft tracks and unballasted tracks are not *per se* dangerous; nor are they unusual. No witness attempts to ascribe the derailment to the condition of the track, and a jury should not be permitted to infer that the wreck resulted from such condition."

Defendants also rely upon the recent decision of the Supreme Court of the United States in Pennsylvania Railroad Co. v. Chamberlain (U. S.), 53 Sup. Ct. 391, 77 L. Ed. 819, in which it was held that the plaintiff failed to make a case for the jury. There, however, plaintiff charged a negligent collision between the car upon which her husband was riding and other cars but had no witness who saw a collision. Plaintiff's witness testified only to hearing a loud crash. There was nothing unusual about such a crash of cars, it happened often in those yards, and it did not sufficiently attract the witness's attention to cause him to at once turn. Employees on the other cars on the same track said positively that they did not collide with that car. Therefore, plaintiff's own evidence showed only facts from which at most "two equally justifiable inferences" might be drawn, one that the crash came from a collision with the car upon which the deceased was riding, the other that it came from switching other cars nearby. Therefore, although a collision was a possible inference, the plaintiff failed to prove either a collision or facts from which a collision would be a reasonable inference. The court said:

"We, therefore, have a case belonging to that class of cases where proven facts give equal support to each of two inconsistent inferences; in which event, neither of them being established, judgment, as a matter of law, must go against the party upon whom rests the necessity of sustaining one of these inferences as against the other, before he is entitled to recover." [The same thing is true of New York

Central Ry. Co. v. Ambrose, 280 U. S. 486, 50 Sup. Ct. 198, 74 L. Ed. 552, also cited by defendants.]

"And the desired inference is precluded for the further reason that respondent's right of recovery depends upon the existence of a particular fact which must be inferred from proven facts, and this is not permissible in the face of the positive and otherwise uncontradicted testimony of unimpeached witnesses consistent with the facts actually proved, from which testimony it affirmatively appears that the fact sought to be inferred did not exist."

That is not the situation here. The testimony here, concerning alleged defects in the track, was testimony as to facts and the existence of such defects is not based on inferences drawn from other facts as was necessary in the Chamberlain case to establish the fact that a collision occurred. Plaintiff's witness did say that he saw many rotten ties, broken tie plates, loose ties, missing spikes and other defects which plaintiff had expert testimony to show would tend to cause a derailment at the lowest speed defendants claimed their train was traveling. Furthermore, there was not absolute, positive, uncontradicted evidence on the part of defendants that none of these defects did exist. True, according to their witnesses' ideas, the track was in good condition, but their evidence showed that ties rot out and have to be replaced; that such ties ordinarily last about seven years; that some of them would become unfit every year; that the ballast must be reshaped every two years; and that different railroads use different methods in spiking rails. It also showed that their section foreman had ideas of his own about how the rails should be spiked. He said: "We don't spike them in full always; sometimes we do and sometimes we don't; generally, we put one spike inside and one out. . . . The more spikes you drive into a tie, the more you cut it up and weaken it. By using one spike out and one spike in, it holds it just as well as four does." The following question, asked defendants' section foreman, and his answer, also shows that this was not a case where there was absolute positive testimony contradicting all the facts to which plaintiff's witness testified concerning defects in the track. "Q. Something has been said by witnesses that you could step on one end of the tie and the other end would raise up; did you have any such condition in there? A. I never noticed them." The jury heard these witnesses describe the track, the manner in which it was maintained and the methods they used. They saw these witnesses, knew their interest, observed them as they did plaintiff's witness, and from their observation had an opportunity to judge their sincerity, ability, care and other qualities upon all of which they might base their judgment as to what conclusion they would reach concerning the condition in which the track was maintained. This is the method provided by our jury system for testing credibility and determining issues

of fact. We hold that there is substantial evidence in this case to show facts from which the jury could reasonably find, with the inferences they might properly draw therefrom, that these defects, testified to, were the proximate cause of the derailment; and that the trial court was correct in overruling defendants' demurrer to the evidence.

It follows from what we have said that defendants' assignments of error concerning the refusal of its withdrawal instructions withdrawing from the jury the assignments of negligence concerning the defective track and excessive speed must be overruled.

Defendants also assign as error the submission of the case without instructions advising the jury as to what theory would warrant a finding for plaintiff. The only instruction, requested by plaintiff, was an instruction on the measure of damages. This court has so frequently condemned this practice that its views upon the subject are now well known and will no doubt be made effective by appropriate action when the matter is properly presented here. Defendants here did not object or save an exception, at the trial, to such a submission; they did not request the court to require plaintiff to offer an instruction outlining a theory of recovery; nor did they request the court to give such an instruction. The question is not therefore preserved for review. The fundamental rules of our appellate practice are that matters of exception can only be preserved for appellate review, as follows:

1.—Properly objecting, at the time, if necessary to obtain a ruling.

2.—Properly excepting to an adverse ruling, at the time. (Instructions are rulings.)

3.—Presenting all exceptions saved, to the trial court to be there decided, by stating such matters in a motion for a new trial as grounds therefor.

4.—Making all exceptions saved part of the record, after the trial court has decided them adversely by overruling the motion for new trial, by writing and presenting them in a bill of exceptions and obtaining its allowance.

5.—Presenting them to the appellate court as assignments of error, and properly briefing them in accordance with its rules. [See Secs. 1008, 1009, 1061, R. S. 1929; State ex rel. Brockman Mfg. Co. v. Miller (Mo.), 241 S. W. 920; Spotts v. Spotts, 331 Mo. 917, 55 S. W. (2d) 977.]

Defendants first objected in their motion for a new trial, which was too late. The matter had then been waived. We note that all charges of negligence stated in plaintiff's petition, which there was no evidence to support, were withdrawn by proper withdrawal instructions. If that had not been done we would reverse the case because of the manner of submission since the jury would have been left free to find for plaintiff upon negligence not shown by sub-

stantial evidence. [Crossno v. Terminal Railroad Assn., 328 Mo. 826, 41 S. W. (2d) 796.] The only remaining charges' of negligence were the two hereinabove discussed and held supported by substantial evidence. We note also that defendants obtained instructions stating that they were not insurers of the safety of fireman Young; and that if the train was derailed by some object placed on the track they were not ·liable. Therefore, the issues were considerably narrowed. Perhaps defendants did not object or except because they were, at the time, satisfied with the manner in which it was being submitted. At any rate, we will reserve our ruling upon these matters until they are properly preserved for our review.

■ Defendants also assign as error the admission of the opinion of the engineer used by plaintiff as an expert as to what speed, of such a train on such a grade and curve under various conditions, would tend to cause derailment; the admission of this witness's opinion that the defects stated to have been observed in the 1200 feet ΄of track west of the bridge would tend to cause derailment; and the opinion of defendant's engineer, on cross-examination, that the engine wheels would not run over a nut and rock such as defendant's witnesses described. We think that these matters were proper subjects for expert testimony. Such matters are not within the experience of average jurors. One test of whether opinions of experts should be received "is whether the court or jury will be aided by receiving such evidence." [22 C. J. 642, sec. 736.] "The necessity for such testimony arises where the subject matter of an inquiry is so far removed from the realm of common experience that the ordinary jury, even when the facts are fully placed before them, cannot fairly be expected to draw a correct inference therefrom, and at the same time no person competent to draw such an inference has personal knowledge of the facts. Under such circumstances the fact that a witness possessing the necessary skill would draw a certain inference from the facts possesses such probate force as justifies its reception as some evidence that such inference is the correct one." [22 C. J. 639, sec. 733; see, also, 11 R. C. L. 572, sec. 7; Muff v. Wabash Ry. Co., 22 Mo. App. 584; Dammann v. St. Louis, 152 Mo. 186, 53 S. W. 932; Benjamin v. Met. Street Ry. Co., 133 Mo. 274, 32 S. W. 590; Gage v. St. Louis Transit Co., 211 Mo. 139, 109 S. W. 13; N. & W. Ry. Co. v. Gillispie, 224 Fed. 316.]

"The governing rule deducible from the adjudicated cases seems to be that the subject must be one of science or skill or one of which observation and experience have given the opportunity and means of knowledge which exists in reason rather than descriptive facts, and, hence, cannot be intelligently communicated to others not familiar with the subject so as to possess themselves of a full understanding of it." [De Donato v. Wells, 328 Mo. 448, 41 S. W. (2d) 184.] The above statements are subject, however, to the qualification

that an expert's opinion "cannot be received if it amounts to a conclusion of law." ·[Fields v. Luck (Mo.), 44 S. W. (2d) 18.] We hold that the court did not err in admitting this testimony.

 We must also overrule defendants' assignments that the court erred in excluding evidence of Union Pacific and M. K. & T. employees, records of convictions and other evidence concerning attempts of the boy, whose deposition was taken by defendants, in the Kansas State Penitentiary, to wreck trains on those railroads, after the derailment of defendants' train. These matters were too far outside of any issue in this case to be properly considered.

The judgment is affirmed. *Ferguson* and *Sturgis, CC.,* concur.

PER CURIAM :—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.