NORFOLK & W. RY. CO. v. GILLESPIE.

(Circuit Court of Appeals, Fourth Circuit. July 17, 1915.)

No. 1309.

1. MASTER AND SERVANT ⬤⟶258—ACTIONS FOR DEATH—SUFFICIENCY OF DECLARATION.

In an action for the death of a railway engineer, caused by the derailment of his train, a count in the declaration alleging that it was defendant's duty to make reasonable rules for the speed of trains over curves, so as to make the operation of the trains safe to its employés, that in performance of such duty it did make a rule requiring a speed of 15 miles an hour, but that it required deceased to run his train at a greater rate of speed than it had fixed as reasonably necessary for safety, and that the derailment was due to this required speed, stated actionable negligence.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 816–836; Dec. Dig. ⬤⟶258.]

2. APPEAL AND ERROR ⬤⟶1047—HARMLESS ERROR—RULINGS ON EVIDENCE.

The tendency of the courts is to enlarge the sphere of discretion of the trial judge in the exclusion and admission of testimony, and a judg-

---

⬤⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ment should not be disturbed for error in his rulings, unless the error is clearly shown to be materially prejudicial.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4132, 4133, 4146–4152; Dec. Dig. ☞1047.]

3. EVIDENCE ☞474—OPINION EVIDENCE—QUALIFICATIONS OF WITNESS.

A person who had run as a railway fireman for some time, and therefore had had an opportunity to observe the effect of low joints, was qualified to express the opinion that the rocking of the tender of an engine, such as he saw just before the derailment of the engine, would result from a low joint in the track.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2196–2219; Dec. Dig. ☞474.]

4. EVIDENCE ☞498½—OPINIONS—COMPETENCY OF WITNESS—EVIDENCE AS TO QUALIFICATIONS.

A railway fireman, in showing his qualification to express an opinion that the rocking of the tender of an engine which preceded a derailment would result from a low joint, was properly permitted to testify that low joints were common, since, if they were common, he had had a greater opportunity to observe their effect.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2290, 2291; Dec. Dig. ☞498½.]

5. EVIDENCE ☞513—OPINION EVIDENCE—QUALIFICATIONS OF EXPERTS.

It was not error to permit a railroad roadmaster and a section foreman, each of whom had had experience and training in keeping railroad tracks safe, and in observing wrecks and their causes, the effects of curves and the speed of trains over them, and the effect of guard rails, to express an opinion as to the degree of curve which required a guard rail.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2317, 2318; Dec. Dig. ☞513.]

6. APPEAL AND ERROR ☞1047—HARMLESS ERROR—STRIKING TESTIMONY.

There was no reversible error in striking out a witness' answer, where he afterwards testified fully on the subject.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4132, 4133, 4146–4152; Dec. Dig. ☞1047.]

7. APPEAL AND ERROR ☞1050—HARMLESS ERROR—ADMISSION OF EVIDENCE.

In an action for the death of a railroad engineer, due to the derailment of his engine, plaintiff alleged negligence on the part of the railroad company in requiring the engineer by its schedules to run at a dangerous rate of speed around a curve, in violation of its own rule laying down a lower speed as safe, in failing to protect the train by a guard rail on the curve, in allowing a low joint or uneven place in the track, and in failing to have the outside rail sufficiently elevated. The conductor of the train was asked, with regard to the part of defendant's road where the accident occurred, what would be a fair rate of speed for freight trains, taking into consideration the stops for water and coal, and work done, and everything else, and he named between 13 and 14 miles an hour. The company's rule required a speed of not exceeding 15 miles an hour on curves; but there was evidence that the company's schedule required a higher speed, and that the usual speed on the particular curve where the derailment occurred was 20 to 25 miles an hour. *Held* that, while the conductor's testimony may have been immaterial, it was not apparent how it could have confused the jury.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1068, 1069, 4153–4157, 4166; Dec. Dig. ☞1050.]

8. MASTER AND SERVANT ☞286—ACTIONS FOR DEATH—QUESTIONS FOR JURY.

In an action for the death of a railway engineer, killed by the derailment of his train while on a curve in the track, it appeared that the

company, for the safety of its employés, adopted a rule requiring freight trains to be run at a speed not exceeding 20 miles an hour, and on curves not exceeding 15 miles an hour, and there was testimony that other railroads had rules requiring the same limits, or even lower speed. There was also evidence tending to show that, contrary to this rule, the schedule required a higher speed, and that the usual speed on the curve where the derailment occurred was 20 to 25 miles an hour. *Held,* that whether the speed required by the schedule was reasonably safe was a question for the jury, though witnesses testified for defendant that a speed of 20 to 25 miles an hour on such curve was safe.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1001, 1006, 1008, 1010–1015, 1017–1033, 1036–1042, 1044, 1046–1050; Dec. Dig. ☞286.]

9. MASTER AND SERVANT ☞289—ACTIONS FOR DEATH—QUESTIONS FOR JURY.
In an action for the death of a railroad engineer, killed by the derailment of his train, where the evidence was conflicting as to whether he was running at a speed greater than that required by the schedule, it was a question for the jury whether the derailment was caused by the engineer's negligence in voluntarily running at an unusual and unnecessary speed.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1089, 1090, 1092–1132; Dec. Dig. ☞289.]

10. MASTER AND SERVANT ☞286—ACTIONS FOR DEATH—QUESTIONS FOR JURY.
In an action for the death of a railroad engineer, killed by the derailment of his train while on a curve in the track, evidence *held* to make a question for the jury as to whether the railroad company was negligent in not having a higher elevation of the outside rail.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1001, 1006, 1008, 1010–1015, 1017–1033, 1036–1042, 1044, 1046–1050; Dec. Dig. ☞286.]

11. MASTER AND SERVANT ☞129—LIABILITY FOR INJURIES—PROXIMATE CAUSE.
That some defect in the track or machinery, or in the operation of a train, must have contributed to its derailment while rounding a curve, did not eliminate the lack of a guard rail and the lack of proper elevation of the outside rail from consideration as proximate causes, as it made no difference what the other defects were, if due care required a guard rail and a proper elevation of the outside track to neutralize such defects and keep the train on the track.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 257–263; Dec. Dig. ☞129.]

12. MASTER AND SERVANT ☞278—ACTIONS FOR DEATH—EVIDENCE—INFERENCES.
Testimony that an engine rocked up and down just before its derailment, and that a low joint would cause such a motion, and that the first sign one witness saw of danger was the tender leaning to one side, was insufficient to warrant an inference that there was a low joint in the track, where an inspection after the accident did not disclose a low joint, as the apparent rocking of the engine and leaning of the tender might have been produced by other causes.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 954, 956–958, 960–969, 971, 972, 977; Dec. Dig. ☞278.]

13. MASTER AND SERVANT ☞286—ACTIONS FOR DEATH—QUESTIONS FOR JURY.
Whether, in view of the facts that on a curve in a railroad track the outside rail was insufficiently elevated and there was no guard rail, it was negligence for the railroad company to require its engineers to run over the curve at the speed required by its schedule, was a question for the jury, even assuming that the manner of constructing the track in-

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

volved an engineering problem left to the discretion of the railroad company, and that the question of the proper method of constructing the track should not be submitted to the jury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1001, 1006, 1008, 1010–1015, 1017–1033, 1036–1042, 1044, 1046–1050; Dec. Dig. ⊂═⊃286.]

14. MASTER AND SERVANT ⊂═⊃219—ACTIONS FOR INJURIES—ASSUMPTION OF RISK.

A railway engineer does not assume the risk of schedule speed on a track not reasonably safe for that speed, unless the defect in the track is obvious, as he is not charged with knowledge of what is necessary to make the track safe, but may assume that the railroad company knows and has taken the necessary precaution, and that its method of construction is reasonably safe.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 610–624; Dec. Dig. ⊂═⊃219.

Assumption of risk incident to employment, see note to Chesapeake & O. R. Co. v. Hennessey, 38 C. C. A. 314.]

In Error to the District Court of the United States for the Western District of Virginia, at Roanoke; Henry Clay McDowell, Judge.

Action by Louella Gillespie, administratrix of A. F. Gillespie, deceased, against the Norfolk & Western Railway Company. Judgment for plaintiff, and defendant brings error. Affirmed.

The conductor, Davis, was asked, relative to the part of defendant's road where the accident occurred, what would be a fair rate of speed for freight trains, taking into consideration the stops for water and coal, the work done, and taking everything into consideration, and answered that he thought between 13 and 14 miles an hour.

W. J. Henson and Roy B. Smith, both of Roanoke, Va. (McCormick & Smith and Jackson & Henson, all of Roanoke, Va., and F. Markoe Rivinus and Theodore W. Reath, both of Philadelphia, Pa., on the brief), for plaintiff in error.

Barnes Gillespie, of Tazewell, Va. (W. H. Werth and Greever & Gillespie, all of Tazewell, Va., on the brief), for defendant in error.

Before KNAPP and WOODS, Circuit Judges, and WADDILL, District Judge.

WOODS, Circuit Judge. The defendant's freight train was derailed on June 8, 1913, near Cleveland, Va., and the engineer, A. F. Gillespie, was killed. In this action his administratrix recovered judgment on these charges of negligence on the part of the railroad company: (1) Requiring the engineer by its schedule to run at a dangerous rate of speed around a curve in violation of its own rule laying down a lower speed as safe; (2) failing to protect the train by a guard rail on the curve; (3) allowing a low joint or uneven place in the track, especially dangerous on a curve; and (4) failing to have the outside rail sufficiently elevated.

[1] The defendant's first position is that the court should have sustained the demurrer to the seventh count, brought into the declaration by amendment. The allegations of this count are: (a) That the defendant owed the duty of making reasonable rules for the speed of

the trains over the curves, so as to make the operation of its trains safe to its employés, and that in performance of this duty it did make a rule requiring a speed of 15 miles an hour, "in order that said employés might operate and run said freight trains over said curves with reasonable safety to themselves"; and (b) that the defendant required Gillespie, the deceased, as one of its engineers, to run freight trains at a greater rate of speed than it had fixed as reasonably necessary for safety on the curves, and that the derailment was due to this required speed. This means that the rule limiting speed to 15 miles an hour was necessary for the reasonable safety of the train, and that the defendant required a speed greater than that which was in fact, and which had been declared by the defendant, necessary to secure safety. Thus interpreted, the count alleges actionable negligence in requiring unsafe speed over the curves as the proximate cause of the death of the engineer. The demurrer was therefore properly overruled.

[2] The numerous objections to the exclusion and admission of testimony are not well founded. The tendency of the courts is to enlarge the sphere of discretion of the trial judge in the exclusion and admission of testimony, and a judgment should not be disturbed for error in his rulings, unless the error is clearly shown to be materially prejudicial.

[3, 4] Combs, who had been a railroad fireman, was allowed to say that such rocking of the tender as that which he saw just before the accident, as he stood about 75 to 100 feet away, would result from a low joint in the track. The objection that he was not qualified to speak on the subject is not well taken, for he testified that he had run as a fireman for some time, and therefore he had had the opportunity to observe the effect of low joints. In showing his qualification to speak on the subject, it was clearly competent for this witness to testify that low joints were common; for, if they were common, he had had the greater opportunity to observe the effect produced by running a train over them.

The question put to the witness Dye, whether he regarded it reasonably safe for the trains to run over these curves without guard rails, was excluded; but it was afterwards put and answered by the witness. This witness, in saying, "I would start with guard railing 10-degree curves, and go up from them," clearly meant that he thought curves of 10 degrees or more required guard rails.

[5] The witnesses, J. H. Lynch, roadmaster, and J. R. Patrick, section foreman, were allowed to express their opinions as to the degree of curve which required a guard rail. In view of the experience and training of these men in keeping the track safe, in observing wrecks and their causes, the effects of curves and the speed of trains over them, and the effect of guard rails, it cannot be said to be error of law for the trial judge to admit their opinions on the point, though they may not have been based on scientific knowledge.

[6] There was no reversible error in striking out the answer of the witness Antrim as to the life expectancy to which he referred being based on a risk, not hazardous or preferred, for the witness afterwards testified fully on the subject.

[7] The testimony of C. B. Davis, a conductor, as to a fair rate of speed for a freight train, may have been immaterial, as the defendant contends; but we do not perceive how it could have confused the jury.

The most important assignment of error is the refusal of the District Judge to direct a verdict at the close of all the evidence.

[8, 9] The rule alleged by the defendant to have been adopted for the safety of its employés requires freight trains to be run on a straight track at a speed not exceeding 20 miles an hour and on curves not exceeding 15 miles an hour. There was testimony adduced from a number of witnesses familiar with the subject that other railroads had rules requiring the same limits and in some instances even lower speed. There was evidence tending to show that, contrary to this rule of safety, the railroad company's schedule required a higher speed than that prescribed by the rule, and that the usual speed on this curve was 20 to 25 miles an hour. It is true the defendant had the testimony of a number of witnesses to the effect that a speed of 20 to 25 miles an hour on the curve was safe. But its own rules of safety, and the rules of other railroads requiring for safety a lower speed, made an issue of fact for the jury as to whether the speed required by the schedule was reasonably safe. 1 Labatt on Master and Servant, 16a, and authorities cited. The defendant's evidence that the engineer was running at a speed greater than that required by the schedule, and the opposing evidence that the speed was not in excess of the usual schedule speed, also made an issue of fact for the jury as to whether the derailment was caused by the negligence of the engineer in voluntarily running at an unusual and unnecessary speed.

To show probable contributing causes of the derailment of the train running at a speed alleged to be unsafe, the plaintiff introduced evidence which it is insisted tended to prove that safety required a guard rail at the curve which had not been supplied, that the outside rail was not sufficiently elevated, and that there was a low joint in the track. If it be assumed that a guard rail would not be necessary on such a curve as this for the safety of a train running at the speed of 15 miles an hour prescribed by the rule, there was evidence to the effect that a guard rail should be put on such a curve when the trains were run at a speed as high as that required by defendant's schedule at this place.

The court was requested to give the following instruction:

"The court instructs the jury that there is no sufficient evidence in this case to justify them in finding a verdict for the plaintiff under count 4 in the original declaration, which alleges that the track and roadbed upon the curve at which the accident happened was not in reasonably safe condition on account of gauge, alignment, spreading of track, elevation of rail, defective and unsound cross-ties, loose rails, ballasting, etc."

[10, 11] The charge that there was an insufficient elevation of the outside rail depends on the testimony of Stimson, an expert witness of the defendant, who testified that a curve of 13 degrees, with a track elevation of between 4½ and 5 inches, with the alignment, the ties, the ballast, the rails all good, with no guard rail, would be reasonably safe

for a freight train running at a speed of 25 miles an hour. But he further testified as follows:

"Q. What is the proper elevation of the outside rail on a 13-degree curve for a freight train running at the rate of 25 miles an hour? A. It is approximately 5 inches; it may be a fraction above. I do not carry in my mind all of those elevations; but there is a table given in there. Q. I will get you to examine the table, and see if it is not 5⅝ inches? A. It is something like that. I cannot possibly carry these various elevations in mind (witness examines book); 5⅝ inches elevation is right. Q. A track then that has an outside elevation from 4½ to 5 inches would not have the proper elevation for a speed of 25 miles an hour, would it? A. It wouldn't have it theoretically; it would not have the theoretical elevation, but I would not say a proper. Q. What is the difference between proper and theoretical? A. For this reason, a speed or an elevation that is a fraction of an inch less would be perfectly safe. Those tables are based on a theoretical elevation for good comfortable riding; in other words, a centrifugal force is neutralized by the elevation, they lean the car over enough to overcome that sensation of overturning which you experience as a train goes around a curve. Q. Isn't the elevation given in this table the proper elevation? A. It is the elevation that has been adopted as the normal elevation and the correct elevation. Q. And the proper elevation? A. Yes. Q. Anything less than 5⅝ inches is just that much less than what is considered the proper elevation, isn't it? A. For that speed, yes. Q. And the amount of the improper elevation will depend on the amount of the elevation less than 5⅝ inches? A. Yes, sir. Q. What is the proper elevation on a 13-degree curve for 30 miles an hour? A. I cannot state from memory. Q. Well, look at the book and tell us. A. (Witness examines book) 7¾ inches. Q. 7¾ inches for 30 miles an hour? A. Yes. Q. And as you increase the speed of a train on any given curve, you increase the ratio of the elevation of the outside rail, don't you? A. Yes, sir. Q. The safety of the running of a train decreases as you get away from the proper elevations, which are given in this table; is that not true, at the rate of speed given in the table? A. Yes, that is true."

The table prescribing an elevation of 5⅝ inches for a freight train running at 25 miles an hour, he testified, was prescribed by the American Railway Engineering Association. The variation from this elevation of three-eighths to seven-eighths of an inch was evidence from which the jury could infer that the elevation was unsafe. The court, therefore, could not take from the jury the question whether the defendant was negligent in not having a guard rail, or in not having a proper elevation of the outside rail. Of course, even if there was negligence in these respects, it would not avail the plaintiff, unless the jury could reasonably infer from the evidence that it was a proximate cause of the accident. There is no direct evidence that it was. Some defect in the track, machinery, or the operation must have contributed to the derailment; otherwise freight trains would not have been running without a guard rail and with the existing elevation for a very long time without accident. Yet this does not eliminate the lack of a guard rail and lack of proper elevation of the outside rail from consideration as proximate causes. Proper elevation of the outside rail was a necessary precaution to hold the train on the track, when, from excessive speed, there was a tendency to leave the track. The office of a guard rail is to hold the train on the track, when, from speed or defects in the engine, cars, or track, there will be a tendency to derailment. It makes no difference what the other defects were, if due care required a guard rail and proper elevation of the outside track to neutralize them and

keep the train on the track. The inference would not be unreasonable that the guard rail and proper elevation would probably have prevented the train from leaving the track, and that undue speed over a curve, without a guard rail or without proper elevation, contributed proximately to the derailment, though other causes, not alleged by the plaintiff and not discovered, may have co-operated.

It is insisted, however, that the defendant has shown affirmatively that a guard rail would not have prevented the derailment by proving that the tender turned over and that its wheels did not climb the rail. Without extended analysis of the evidence it seems sufficient to say that this inference would depend largely on the ascertainment of the exact point where the tender left the track; and the evidence on that point would support reasonably a conclusion that the wheels of the tender did not rise from the track at the moment of the derailment, but ran over the rail onto the cross-tie. In addition, the tender may have turned over at the moment the flange rode the rail and just as it reached the cross-ties. We think, therefore, that the instructions requested, that neither the absence of the guard rail nor the improper elevation could be considered by the jury as proximate causes of the derailment, were properly refused.

[12] The witness Combs testified that the engine rocked, or went up and down, and that a low joint would cause such motion. The engineer of the rear engine on the same train testified that the first sign he saw of danger was the tender leaning off to one side. The apparent rocking of the engine and leaning of the tender would be insufficient evidence from which to infer that there was a low joint in the track, for this appearance might have been produced by other causes, such as very high speed on a curve or defects in the wheels or trucks. Inspection after the accident did not disclose a low joint. A conclusion under these circumstances that there was a low joint, and that it was the cause of the derailment, would be based on conjecture. There was no separate request made for an instruction that there was no evidence of a low joint operating as a proximate cause of the derailment.

[13] It is insisted, next, that it is an engineering question, not proper to be submitted to the jury, whether a guard rail should have been provided, or whether there should have been a different elevation. The principle is thus laid down in Tuttle, Adm'x, v. Detroit Railway Co., 122 U. S. 189, 7 Sup. Ct. 1166, 30 L. Ed. 1114:

"We have carefully read the evidence presented by the bill of exceptions, and, although it appears that the curve was a very sharp one at the place where the accident happened, yet we do not think that public policy requires the courts to lay down any rule of law to restrict the railroad company as to the curves it shall use in its freight depots and yards, where the safety of passengers and the public is not involved; much less that it should be left to the varying and uncertain opinions of juries to determine such an engineering question. * * * The interest of railroad companies themselves is so strongly in favor of easy curves as a means of facilitating the movement of their cars that it may well be left to the discretion of their officers and engineers in what manner to construct them for the proper transaction of their business in yards, etc. It must be a very extraordinary case, indeed, in which their discretion in this matter should be interfered with in determining their obligations to their employés."

The rule is also stated in Potomac R. R. v. Chichester, 111 Va. 152, 68 S. E. 404. The language above quoted from Tuttle v. Detroit Ry. Co. has been held to be a dictum in Gordon v. Railway Co., 129 Iowa, 747, 106 N. W. 177.

But, even if it be regarded an accurate statement of the law, the question whether the method of using the track after it is constructed is negligent or not is an issue for the jury. As already indicated, this case does not depend upon the bald issue whether the defendant was negligent in constructing its track with a 13-degree curve, without a guard rail, and with insufficient elevation; for it is not denied that that construction would be safe for trains run at a speed suitable to it. The issue which was properly submitted to the jury was whether, considering the method of construction which the defendant had chosen to adopt, it was not negligence to require its engineers to run over the curve at the speed required by the schedule. Patton v. Southern Railway Co., 82 Fed. 979, 27 C. C. A. 287.

[14] It is next contended that the engineer assumed the risks of running on the curve without a guard rail and insufficient elevation. An engineer does not assume the risk of schedule speed on a track not reasonably safe for that speed, unless the defect in the track is obvious. He is not charged with knowledge of what is necessary to make the track safe, but may assume that the railroad company knows and has taken the necessary precaution, and that its method of construction is reasonably safe. The rule is thus laid down in Seaboard Air Line v. Horton, 233 U. S. 492, 34 Sup. Ct. 635, 58 L. Ed. 1062:

"Such dangers as are normally and necessarily incident to the occupation are presumably taken into the account in fixing the rate of wages; and a workman of mature years is taken to assume risks of this sort, whether he is actually aware of them or not. But risks of another sort, not naturally incident to the occupation, may arise out of the failure of the employer to exercise due care with respect to providing a safe place of work and suitable and safe appliances for the work. These the employé is not treated as assuming, until he becomes aware of the defect or disrepair and of the risk arising from it, unless defect and risk alike are so obvious that an ordinarily prudent person under the circumstances would have observed and appreciated them. These distinctions have been recognized and applied in numerous decisions of this court."

This principle was restated and applied in a case analogous to this. Gila R. Co. v. Hall, 232 U. S. 94, 34 Sup. Ct. 229, 58 L. Ed. 521.

All of the assignments of error with respect to giving or refusing instructions are determined by what has been said, or were covered by proper instructions given. This case has been presented with marked ability on both sides, but the labor of this court and the trial court has been greatly increased by very numerous requests to charge, presenting such shadowy distinctions that it is perfectly manifest the jury would be confused rather than enlightened by them.

Affirmed.