## HUBBARD v. ASSOCIATED PRESS.

### No. 4823.

Circuit Court of Appeals, Fourth Circuit.

Nov. 21, 1941.

W. Brantley Harvey, of Beaufort, S. C., for appellant.

W. C. McLain, of Columbia, S. C. (Moynihan & McKeown, of New York City, on the brief), for appellee.

Before SOPER and DOBIE, Circuit Judges, and CHESNUT, District Judge.

DOBIE, Circuit Judge.

This action to recover damages for alleged libel was commenced by the appellant, Grayson K. Hubbard (hereinafter called the plaintiff), against The Associated Press, a New York news reporting agency, in the Court of Common Pleas of Beaufort County, South Carolina, in October, 1937, and was duly removed to the United States District Court for the Eastern District of South Carolina. The action was based upon a news article furnished by The Associated Press and published in The Morning News of Savannah, Georgia, February 13, 1936. The complaint also set forth news articles published in The Savannah Morning News, Savannah Evening Press, and The Beaufort Gazette in November, 1933. The news articles published in 1933 were accounts of the fatal wounding of Lawrence H. Harrison, a citizen of Savannah, Georgia, on the properties of Varn Turpentine and Cattle Company in Beaufort County, South Carolina. These articles possibly import that the shooting of Lawrence H. Harrison was brutal and in cold blood.

The facts leading up to the alleged libelous article were that Lawrence H. Harrison was shot and mortally wounded in Beaufort County, South Carolina, on the night of November 23, 1933, and died several days thereafter in the City of Savannah. Harrison was killed on a large tract of land in Beaufort County, belonging to the Varn Turpentine and Cattle Company. The plaintiff, Grayson K. Hubbard, and one T. M. Williams, who were woods riders for the company, were arrested upon a warrant, charging them with the shooting of Harrison, but they were never indicted or tried.

In 1934, Mrs. Eliza Warth, as administratrix of the estate of Lawrence H. Harrison, brought an action against the Varn Turpentine and Cattle Company, alleging in her complaint, among other things: "That in the early morning hours of the 23rd day of November, 1933, as plaintiff is informed and believes, on a tract of land known as Palmetto Bluff, in Beaufort County, South Carolina, the defendant, Varn Turpentine and Cattle Company, by its agents, servants and employees, G. K. Hubbard and/or T. M. Williams, negligently, unlawfully, wilfully, wantonly, recklessly and maliciously did shoot and wound the said Lawrence H. Harrison, and by reason of the aforesaid negligent, unlawful, wilful, wanton, reckless and malicious conduct and acts of the defendant, by its said agents, servants and employees, the said Lawrence H. Harrison was horribly wounded, injured and mutilated to such an extent that the said wounds finally resulted thereafter in his death."

The trial of the case against Varn Turpentine and Cattle Company was commenced in the federal court at Aiken, South Carolina, on February 12th, 1936, and on the morning of February 13th, 1936, the alleged libelous article was published in The Savannah Morning News. The article read as follows:

"Aiken, S. C., Feb. 12 (AP)—The trial of Mrs. Eliza Warth's $200,000 suit against the Varn Cattle and Turpentine Company, Inc., of Beaufort, for the death of her brother, Lawrence H. Harrison, began in United States District Court here today.

"Harrison was fatally wounded Nov. 23, 1933, by Grayson T. Hubbard, a range rider on the company's property near Bluffton. When a criminal case against Hubbard was made, The Beaufort County grand jury did not indict him.

"The defense claimed that Harrison with others was poaching on posted property by hunting deer at night.

"Among the witnesses today were Mrs. Roberta Parker, John Robert and Dr. J. O. Baker, all of Savannah, Georgia. One of the defense attorneys, E. W. Wilcox, is also from Savannah."

From the previously published articles it is inferable that in the community in which Harrison was shot, it was quite generally thought that he was ambushed and shot in

cold blood. There was no evidence in the record to show that the plaintiff, Grayson K. Hubbard, did inflict the fatal wound from which Harrison died, nor is there any evidence in the record from which any such inference could reasonably be drawn.

At the trial of Grayson K. Hubbard's action against The Associated Press, the presiding judge allowed several witnesses to testify as to their actual understanding of the allegedly libelous article, which was to the effect that it charged Hubbard with murder. The defendant claims that this testimony was incompetent. On the other hand, the trial judge refused to admit in evidence the news articles published in 1933 in The Savannah Morning News, The Savannah Evening Press, and The Beaufort Gazette. The plaintiff claims that this was likewise error. At the conclusion of the plaintiff's testimony, the trial court directed a verdict for the defendant upon the ground that the news article published in The Savannah Morning News, February 13, 1936, was neither libelous per se, nor per quod, and upon the further ground that it was a fair and impartial account of a judicial proceeding and was therefore privileged.

After careful consideration, we are of the opinion that the trial court erred in directing a verdict for the defendant, and that the case should have been permitted to go to the jury on the question of whether or not the article was libelous.

It has been said many times that the standard of interpretation to be used in testing allegedly defamatory matter is how those in the community in which this matter was published would reasonably understand it. E. g., Washington Post Co. v. Chaloner, 250 U.S. 290, 39 S.Ct. 448, 63 L. Ed. 987. In the Chaloner case, Mr. Justice McReynolds quoted with approval the following language used by Judge Lurton in Commercial Publishing Co. v. Smith, 6 Cir., 149 F. 704, 706, 707: "A publication claimed to be defamatory must be read and construed in the sense in which the readers to whom it is addressed would ordinarily understand it. * * * When thus read, if its meaning is so unambiguous as to reasonably bear but one interpretation, it is for the judge to say whether that signification is defamatory or not. If, upon the other hand, it is capable of two meanings, one of which would be libelous and actionable and the other not, it is for the jury to say, under all the circumstances surrounding its

publication, including extraneous facts admissible in evidence, which of the two meanings would be attributed to it by those to whom it is addressed or by whom it may be read." Washington Post Co. v. Chaloner, 250 U.S. 290, 294, 39 S.Ct. 448, 63 L. Ed. 987. See, also, Phillips v. Union Indemnity Co., 4 Cir., 28 F.2d 701, citing the Chaloner case, Maas v. National Casualty Co., 4 Cir., 97 F.2d 247.

We are of the opinion that the allegedly libelous article involved here is susceptible of being construed as having a defamatory meaning by those to whom it was addressed or by whom it was read. This ipso facto brands it as a jury question. Cf. Duncan v. Record Publishing Co., 145 S.C. 196, 143 S.E. 31; Hubbard v. Furman University, 76 S.C. 510, 57 S.E. 478. The article admittedly stated that Grayson K. Hubbard fatally wounded Harrison, and without further explanation of the killing, added that the defense claimed that Harrison was poaching on posted property. Without deciding whether the publication complained of actually imputes the commission of a criminal homicide, we believe the language used is clearly capable of such a construction; for a fatal wounding is not justified or excused because of a mere trespass upon real estate under the circumstances stated. In the Chaloner case, supra, the publication was: "* * * Chaloner * * * is recuperating at Shadeland * * * where he had gone to recuperate following a nervous breakdown as a result of the tragedy at his home * * * when he shot and killed John Gillard, while the latter was abusing his wife, who had taken refuge at Merry Mills, Chaloner's home * * *."

The defendant relies heavily on the fact that the article contained a statement that when a criminal charge was advanced against the plaintiff, the Beaufort County grand jury did not indict him. Counsel contends that this miraculously purged the publication of any latent defamatory meanings which might lie embedded within it. There is no merit in this contention. A refusal by the grand jury to indict does not by itself exonerate a man from guilt and such a refusal may be caused by numerous factors. To many readers of this article, it is probable that the refusal to indict meant that insufficient evidence was then available; this is but one of several possible constructions. Suffice it to say that the previous stigmatization, if any

there was, was not thus easily eradicated. As was said by Mr. Justice Holmes: "If the [publication] obviously would hurt the plaintiff in the estimation of an important and respectable part of the community, liability is not a question of a majority vote." Peck v. Tribune Co., 214 U.S. 185, 190, 29 S.Ct. 554, 556, 53 L.Ed. 960, 16 Ann.Cas. 1075. Accordingly, we feel it was the plaintiff's right to prove his case and go to the jury upon the question of whether or not the article was libelous.

■ As we have indicated, the defendant complains of the admission by the court below of the testimony of several witnesses, who had read the article, as to their understanding of the article, or, in other words, just what the article meant to each of these witnesses. On the other hand, the plaintiff strenuously complains because the lower court excluded the articles published in newspapers in 1933, more than two years prior to the publication by the defendant of the article alleged to be libelous. In each of these instances, the admission of the evidence is open to extremely serious question, in the light of the decided authorities. Since we have decided, reversing the lower court, that the question of whether or not the article is libelous should be submitted to the jury, it may well be that this evidence will not be sought to be introduced at the next trial. We, accordingly, do not pass, in either of the two instances, upon the admissibility of this evidence. There is, of course, no objection to the introduction by the plaintiff of proper evidence tending to prove such relevant facts and such germane circumstances surrounding the publication of the article in question as will aid the jury in deciding whether or not this article was libelous.

■ The second ground on which the lower court directed a verdict for the defendant was that the article was privileged as a fair and impartial report of a judicial proceeding—namely, the action by the administratrix of Harrison against the Varn Turpentine and Cattle Company for the death of Harrison by allegedly wrongful act. This defense of privilege must, of course, be alleged and proved by the defendant. The privilege of the press to publish with impunity judicial proceedings, Sherwood v. Evening News Ass'n, 256 Mich. 318, 319, 239 N.W. 305, is qualified to the extent that the report, if defamatory, must be complete and accurate; for there is liability if an inaccurate, incomplete and

fragmentary account makes false imputations against the plaintiff which a true and complete report would not have conveyed. Sweet v. Post Publishing Co., 215 Mass. 450, 102 N.E. 660, 47 L.R.A.,N.S., 240, Ann.Cas.1914D, 533. See, also, Harper on Torts, Sec. 250. In the instant action, the verdict was directed at the end of the plaintiff's case, before any evidence was introduced by the defendant. The record is, thus, quite meagre as to the facts and circumstances of the civil action by the administratrix of Harrison against the Varn Turpentine and Cattle Company. Accordingly, we cannot decide at this time whether or not the publication complained of is a fair and impartial report of a judicial proceeding and is therefore privileged. Normally, whether the published account of a judicial proceeding is fair, impartial and accurate, is a question for the jury. See Vaughan v. News Leader Co., 4 Cir., 105 F.2d 360.

For the foregoing reasons, the judgment of the lower court is reversed and the case is remanded to the District Court for a new trial.

Reversed and remanded.