### DUNCAN v. PEARSON.
### No. 5029.

Circuit Court of Appeals, Fourth Circuit.

April 12, 1943.

---

Frank G. Tompkins, of Columbia, S. C. (Tompkins & Tompkins, of Columbia, S. C., on the brief), for appellant.

Donald Russell, of Spartanburg, S. C. (Pinckney L. Cain, of Columbia, S. C., Daniel & Russell, of Spartanburg, S. C., and Thomas, Cain & Black, of Columbia, S. C., on the brief), for appellee. .

Before PARKER, SOPER, and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

Daniel T. Duncan brought a civil action in the United States District Court for the Eastern District of South Carolina against Drew Pearson, individually and as one of the co-partners writing and publishing under the trade name of "The Daily Washington Merry-Go-Round", for an alleged libelous article published of and concerning Duncan on November 25, 1938. The article published by Pearson, for which Duncan seeks damages in the sum of $200,-000, was as follows:

"Buzzard's Roost—

"One reason a lot of voters last election turned sour on the New Deal, despite tremendous spending, is the inconsistency and laxness of administration in Washington.

"Take, for instance, PWA's famous Buzzard's Roost power project in Greenwood county, S. C., which the Duke Power Company fought for three years, until the Supreme Court overruled them.

"Instead of promoting good-will for Roosevelt in South Carolina, the project has turned a lot of people against him. Here are the reasons:

"1. Bare subsistence wages are paid. Truck drivers are getting $6 and $7 a week. Roosevelt has accused Southern big business of depressing wage levels, but his administrators are permitting exactly the same thing. At the neighboring Santee-Cooper project, A. F. of L. protests finally increased wages, but not at Buzzard's Roost.

"2. It now turns out that Dan Duncan, promoter and engineer for Buzzard's Roost, will be the chief beneficiary. Formerly an unemployed engineer, Duncan high-pressured the power project to the Greenwood county finance board; they applied for

PWA funds. He makes 6 per cent of the total contract, or about $180,000. Meanwhile a lot of people in the county are wondering what they will do with the power.

"3. Workers resent the fact that PWA is paying Greenwood officials federal cash, while their wages are low.

. "Local Officials—

"Various members of the Greenwood county finance board have received funds from the federal grant. These include E. L. Brooks, chairman of the board, paid last summer at the rate of $50 monthly; M. G. Bowles and W. M. Rogers, members of the board, paid the same; E. I. Davis, secretary of the board, paid $375 for June and July; Alice Steifle, board stenographer, paid $45 a month, R. C. Lomnick, county superintendent of schools, $50 a month.

"What particularly gripes a lot of South Carolinians is that these payments apparently have been OK'd in Washington. Folks can't understand a system which underpays labor, supposedly the friend of Roosevelt, and then rewards local officials with jobs of their own.

"Note—When the Public Works Administration was asked to investigate alleged Buzzard's Roost dirt, it sent as investigator Francis Belue, whose brother is bookkeeper for the Lee Construction Company, builders of the project's power house. Investigator Belue whitewashed the Roost."

Duncan, in his complaint, alleged that this article was libelous in that it was written " * * * of the plaintiff in connection with and concerning his profession as a construction engineer and was calculated to bring the plaintiff into disrepute with the government administration and that it inferred and led those who read it to believe that the plaintiff was dishonest, wanting in integrity and had been guilty of fraud and dishonest dealing; and that by reason of the publication thereof he had been brought into disrepute and had been humiliated and embarrassed, both in his personal and professional reputation."

The answer of Pearson to this complaint admitted the publication of the article but alleged by way of an affirmative defense that Pearson had the right to publish and comment upon matters of public interest and that the statements contained in the article were true and set forth no fraud or dishonesty on the part of Duncan. The answer further alleged that the article was published without malice in a bona fide desire to acquaint the public with matters of general interest concerning the use of public funds.

During the trial of the case, Duncan sought to introduce in evidence an article concerning him published by Pearson on September 6, 1938, together with certain correspondence with respect to this article, had with Pearson. This evidence was excluded by the trial court on the ground that this previous article was inadmissible in order to establish malice on the part of Pearson, inasmuch as the article itself was not libelous.

The issues were subsequently submitted to the jury by the trial court under fair and comprehensive instructions and the jury returned a verdict in favor of Pearson. Duncan then moved for a new trial but the motion was overruled. Judgment was thereafter entered for Pearson and Duncan has duly taken an appeal to this Court. We are now concerned with the propriety of the trial court's action in excluding the evidence of the former publication made by Pearson concerning Duncan and the ensuing correspondence pertaining thereto.

The article in question, which was held to be inadmissible, was included in the daily column written under the name of "The Daily Washington Merry-Go-Round" by Pearson and Allen, published on September 6, 1938. It read as follows:

"S. S. Post-Mortem:

"There is no one on the floor of the Senate whom Secretary of Agriculture Wallace would take greater delight in having purged than 'Cotton Ed' Smith, of South Carolina.

"Senator Smith is chairman of the Senate agricultural committee, and as such has been a consistent opponent of Henry Wallace's farm bills. His retirement would make Henry's work immeasurably easier.

"But, perhaps without knowing it, it was Henry Wallace, who may have contributed most to Cotton Ed's renomination.

"It happens that South Carolina cotton farmers always had measured their farm acreage by guesswork or surveying instruments, and this year Secretary Wallace decided to measure acreage through airplane photographs.

"When these new airplane measurements came in, there was untold wrath and indignation among the cotton farmers of South Carolina. For in many cases, the airplane measurements were out of line

with previous estimates, and the farmers had to plow under an extra acre or so of cotton—all without receiving benefits from it.

"This aroused farm wrath against the New Deal, and helped nominate Smith, its opponent.

"Another important reason for the victory of Senator Smith was that Senator Jimmy Byrnes, supposed 'great friend' of F. D. Roosevelt, wanted Smith to win. Byrnes felt that Cotton Ed, because of his age, might not stay in the Senate indefinitely, and that if a vacancy should occur, he, Byrnes, might determine the senatorial successor.

"Another factor influencing the South Carolina primary was that many workers on PWA projects simply did not and do not vote. One big PWA project, Buzzard's Roost, is in the charge of Project Promoter Ben Duncan. He and his chief engineer, Ben Griswold, both were opposed to any candidate whom the President favors.

"Whether their workmen knew this or not, it is a fact that only one man asked for permission to leave the Buzzard's Roost project and come home to vote."

Even a cursory reading indicates that this article does not contain any derogatory or libelous matter concerning Duncan. In reply, however, Duncan wrote the following letter on September 8, 1938, addressed to Robert Allen:

"Daniel T. Duncan
"Engineering Company
"Ninety-Six, S. C.
"September 8, 1938
"Robert S. Allen
"Washington Merry Go Round
"Washington, D. C.
"Dear Sir:

"Enclosed you will find a clipping from the Index-Journal at Greenwood, S. C., answering a paragraph in the Merry-Go-Round which paragraph is quoted in the enclosed clipping.

"I feel honored in being mentioned in your Merry Go Round and I have enjoyed your articles so much all along and my hat is off to you for publishing anything that you want to. The freedom of the press is the most wonderful thing in any nation, and, when that is lost, any country is lost.

"Now I am so strongly Roosevelt that I would cast my vote for any candidate that he wants.

"You can see from the clipping how far from facts all of this article was and I am going to ask you two favors:

"1. That you have dinner with me when I come to Washington next time.

"2. Please check the source of information for the article to see if my arch enemies, the power companies or Liberty Leaguers, put out this propaganda to injure both this and several other power projects that I represent.

"Yours very truly,
"D. T. Duncan Engineering Co.
"By D. T. Duncan.
"DTD:GRC"

Here again is further proof of the then friendly relationship that existed between the respective parties, for the tone of this letter is couched in commendatory terms, entirely free from rancor or ill-will. Pearson's answering letter of September 19, 1938, stated:

"The Daily Washington Merry-Go-Round
"Washington, D. C.
"Robert S. Allen          Drew Pearson
"1522 Twenty-Eighth      2820 Dumbarton
   Street                   Avenue
"September 19, 1938
"Mr. D. T. Duncan,
"Duncan Engineering Company,
"Ninety-Six, South Carolina.
"Dear Mr. Duncan:

"Thank you for your kind letter which I have delayed answering due to being in New York City. I, rather than Mr. Allen, was responsible for the story to which you take exception. Let me say that the information came to me from a gentleman connected with the project and who apparently was in a position to know. He is a man I have known for some years and I talked with him on the long distance telephone.

"However, Mr. Allen and I appreciate very much the spirit of your letter as well as your cordial invitation, and we most certainly will take you up on it when and if one of us can come down to your delightful part of these United States.

"With kindest regards.
"Sincerely yours,
"DP:EH"          "(S) Drew Pearson.

This letter is certainly written in a cordial vein, free from defamatory implications and without the slightest intimation of any hard feelings harbored by either party against the other. We shall now proceed to discuss the applicable South Carolina law in the light of the above facts.

150

Rule 43 of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, provides in part: "All evidence shall be admitted which is admissible under the statutes of the United States, or under the rules of evidence heretofore applied in the courts of the United· States on the hearing of suits in equity, or under the rules of evidence applied in the courts of general jurisdiction of the state in which the United States court is held."

It is well settled that the proof of express malice by Pearson was essential to a recovery by Duncan insofar as Pearson pleaded that the article was published in fair comment on public affairs so as to make it qualifiedly privileged. Switzer v. American Ry. Express Co., 1922, 119 S.C. 237, 112 S.E. 110, 26 A.L.R. 819. Consequently, the prior article published by Pearson would have been admissible if it tended to show that Pearson was actuated by express malice in publishing the article sued upon. We cordially agree with the trial court, however, that the prior article of September 6, 1938, was neither libelous on its face nor fairly susceptible of the inference of malice. Accordingly, the wealth of authority cited by counsel pertaining to the admissibility of *other previous defamatory* articles to prove malice on the part of the defendant in a subsequent libel is irrelevant to the precise issue now before us.

We have examined with great care the cases cited by counsel for Duncan and find that in each instance where a prior statement was admitted by the court to establish malice, the prior statement itself was defamatory or manifested extreme ill will against the defendant, e. g., Courtney v. American Express Co., 1922, 120 S.C. 511, 113 S.E. 332, 24 A.L.R. 128; Smith v. Brown, 1914, 97 S.C. 239, 81 S.E. 633; cf. Gill v. Ruggles, 1913, 95 S.C. 90, 78 S.E. 536, 537. Cf. Lehner v. Berlin Publishing Co., 1933, 211 Wis. 119, 246 N.W. 579 with Throckmorton v. Evening Post Co., 1898, 35 App.Div. 396, 54 N.Y. 887.

In the instant case, however, if the previous article of September 6, 1938, was not actionable (as was expressly held by the trial court) it was lawfully published and malice cannot therefore be inferred from its publication. Nor was the previous article necessary in order to determine the true sense and meaning of the publication upon which suit was brought, since the allegedly libelous article was free from any taint of ambiguity. See Smith v. Smith, 1940, 194 S.C. 247, 9 S.E.2d 584. Indeed, we feel that if the first article had been admitted by the trial court, its only effect would have been to confuse, rather than to inform, the jury. See Jacobs v. Cater, 1902, 87 Minn. 448, 92 N.W. 397.

The question under consideration in the instant case was presented to, but not decided by, us in Hubbard v. Associated Press, 4 Cir., 1941, 123 F.2d 864. There does not appear to be any South Carolina decision precisely in point. We are not unmindful of loose language in certain cases from other jurisdictions to the effect that separate publications made by the defendant concerning the plaintiff which are not themselves actionable, are admissible in a subsequent libel suit. E.g., Scott v. Times-Mirror Co., 1919, 181 Cal. 345, 184 P. 672, 12 A.L.R. 1007; Register Newspaper Co. v. Worter, 1908, 33 Ky.Law Rep. 840, 111 S.W. 693. Close scrutiny of such cases, however, reveals that the court in each instance specifically found that the prior admissible statements tended to show malice on the part of the defendant. As we have already seen, this was far from true in the instant situation.

Moreover, the admissibility of a prior publication for the purpose of showing malice in a later publication, with its tendency to introduce extraneous issues and confuse the jury, was a matter resting very largely in the discretion of the trial judge, who in the atmosphere of the trial can decide more correctly than an appellate court could possibly determine whether the admission of evidence of slight probative value would tend to confuse the issues and introduce irrelevant matters to the prejudice of a just decision of the cause. Only where the evidence is clearly admissible or where there has been abuse of discretion in excluding it, should an appellate court interfere with the action of the trial judge. As said by this Court in Norfolk & Western Ry. Co. v. Gillespie, 4 Cir., 1915, 224 F. 316, 320:

"The tendency of the courts is to enlarge the sphere of discretion of the trial judge in the exclusion and admission of testimony, and a judgment should not be disturbed for error in his rulings, unless the error is clearly shown to be materially prejudicial."

The other exceptions urged by appellant are wholly lacking in merit and may be briefly· disposed of. Evidence as.

to the construction placed by witnesses upon the article alleged to be libelous was properly excluded. The language used was clear and there was no proof of, or offer to prove, special circumstances showing that it had any meaning not apparent on its face. The evidence offered as to the effect of the article on the community involved mere conclusions of a general nature. Its exclusion was harmless error in any event, as it was relevant, if at all, only on the amount of damages recoverable and the jury made a general finding for the defendant. City of Charlotte v. Atlanta Bitulithic Co., 4 Cir., 1915, 228 F. 456; Foreman v. Augusta-Aiken Ry. Corp., 1921, 115 S.C. 400, 105 S.E. 893.

The decision of the District Court is affirmed.

Affirmed.